Robbin E. RIDLING *v.* STATE of Arkansas

CR 04-48

203 S.W.3d 63

Supreme Court of Arkansas
Opinion delivered January 27, 2005

*Patrick J. Benca* and *John Wesley Hall, Jr.*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

BETTY C. DICKEY, Justice. Appellant Robbin R. Ridling was convicted of capital felony murder by a Miller County jury and was sentenced to life imprisonment without parole. Ridling brings seven (7) points on appeal, none of which has merit. We affirm.

### Background

Ridling and his wife, Lisa Graf, lived in Texarkana, Arkansas, in a duplex adjoining that of Betty Tullis, the girlfriend of Roy Baskett, the victim. Baskett became friends with Ridling and Lisa, and continued that friendship after Betty and Baskett had stopped dating, and she had moved from the duplex into a home in May 2002.

Tensions first began between Baskett and the Ridlings in July of 2002, when Baskett's wallet, containing his dog tags, was missing. Baskett suspected that either Lisa or her good friend, Lisa Hickey, had stolen the wallet. On July 27, 2002, while Ridling was working in Little Rock, Baskett stopped by their duplex to visit with Lisa. While there, Baskett discovered that the Ridlings had captured a raccoon using a trap provided by the city. Baskett became upset and left, but returned shortly thereafter, smashed the cage, and freed the raccoon. Lisa called Ridling, who told her not to call the police, but said he would talk to Baskett the next day. However, Lisa and Ridling called law enforcement instead, then called Baskett to tell him how upset the incident had made her and that she was not going to pay for the cage.

About the third week of July 2002, Don Mitchell overheard an answering machine message recorded on Baskett's telephone from a "Robbin" who angrily told Baskett he had gone too far by destroying the animal trap and that he intended to either "whip" or "kick Baskett's ass" in retaliation.

In August of 2002, Betty and Baskett started seeing each other again, and on Saturday, August 3, 2002, he stopped by Betty's house about 8:30 p.m., but Betty was going to dinner with a friend. Before she left, Baskett asked her for his captain's bars, telling her that he "was going on a mission." Baskett did not give Betty any other details. Baskett drove to the duplex and told Ridling that "he was nothing but a piece of shit, he never served his country, had never been in the armed forces," and that Lisa was a slut. Baskett told Ridling and Lisa that he heard that Lisa had cheated on her first husband and that she was not the person he thought she was. Baskett then accused Lisa of being in cahoots with Lisa Hickey to steal his wallet.

Baskett challenged Ridling to fight, to which Ridling responded, "I don't want to fight an old man, and besides that, you're packing heat." Baskett demanded that Lisa return a gun that he had given her, which she did. While Lisa and Ridling were getting the firearm, Ridling told Lisa that Baskett had a gun with him and that they better empty the bullets out of this gun. After Baskett left, Lisa told Ridling that she did not want Baskett over at their house anymore and that she wanted Ridling to take care of the situation. Lisa asked Ridling to let her call the police but he refused.

On his way home, Baskett stopped by Willie Chiles's home and told him about the confrontation. Chiles, Baskett's neighbor, testified that Baskett was upset, and after showing Chiles two guns, said that he would be needing one of his guns that evening. Betty returned to her home about 9:45 p.m., and Baskett returned there around 10:00 p.m., with the firearm, where they spent the night together.

The next morning, Sunday, August 4, 2002, Baskett and Betty left her home and went to Baskett's. Betty left there between 10:00 a.m. and 11:00 a.m. to do her weekly shopping.

Lisa testified that Ridling awoke about noon on Sunday, August 4, 2002. She told Ridling that she was still upset and that he needed to "handle this situation. Take care of it, Robbin. I don't want him back over here acting that way. I don't want to have to deal with it. I don't want him bringing guns back to my house." Ridling then picked up a baseball bat and keys to his 1992 blue Dodge Dakota extended cab truck, and said that he had to go take care of some things. He told Lisa he was going jogging and was taking the bat back to Wal-Mart. He left wearing black shorts, a

red muscle shirt, and tennis shoes. Sometime thereafter, Lisa went by Wal-Mart and the place where he normally jogged, but did not see him or his truck. Lisa tried calling Ridling, but he did not answer.

At approximately 12:30 p.m. that day, Florence Seale, Baskett's across-the-street neighbor, was looking out her window when she saw Ridling's truck pull up to the Baskett home. Baskett got into Ridling's truck and the two drove away. Seale saw nothing out of the ordinary in either man's behavior.

Ridling returned home around 3:00 p.m. carrying his tennis shoes and socks, which were wet and grassy. He started the washer, took his shoestrings out of his shoes, and threw his shoes in the washing machine. Ridling then began scrubbing the shoestrings in the sink; actions Lisa testified that were highly unusual. He then took off the red muscle shirt and took a shower. Lisa never saw that shirt nor the socks again after that afternoon. Ridling told Lisa that he had gone jogging and then had to change a flat tire. Ridling eventually dressed and left for work at UPS some time around 6:00 p.m. Later, Lisa drove by UPS and noticed that Ridling had his truck pulled up to the building with both doors open and was holding a water hose. She thought it odd that he was spraying water on the inside of his truck. Lisa did not stop at that time, but she did return before Ridling left in his UPS truck. At 7:04 p.m., Lisa called Ridling to make sure that he was on the road. She went back out to UPS, and using her spare key, opened the truck door. She noticed that the interior, particularly the passenger side, was wet, and she saw the baseball bat in the back. Later that night Lisa called Ridling seven times on his cell phone, asking him several times about his activities that day, but he would never give her a direct answer.

On August 5, Lisa began calling Ridling at 5:43 a.m., with seven more calls between the two by 10:00 a.m. Phone records place Ridling's cell phone within two to fourteen miles of the Hope Upland Wildlife Management Area. When Lisa returned home, around noon, Ridling was back at home. Around 5:00 p.m., while appellant was asleep, Lisa, again, looked in Ridling's truck to see if his tire was really flat. She did see a tire and two white trash bags. She testified that the bags did not feel as though they contained ordinary trash, but rather something that was both hard and soft. She also testified her husband never hauled trash in his truck.

On August 6, 2002, when no one had heard from Baskett, a missing person's report was made. Texarkana Police Detective Bobby Jordan began an investigation, interviewing Betty, Willie Chiles, and Florence Seale. Detective Jordan and Detective Ed Chattaway interviewed Lisa, who said that she had not seen Baskett for at least two weeks. After the officers left, Lisa spoke with Ridling who denied having done anything to Baskett, but cautioned Lisa to stick to the story she had told the police.

Detectives Jordan and Chattaway interviewed Ridling and Lisa, who both said that they had not seen Baskett in a couple of weeks. Appellant also stated that he was home all day on Sunday, August 4, 2002, until he left for work around 6:00 p.m., and that his vehicle had not been over at Baskett's house. Ridling told the officers about the raccoon incident and about Baskett accusing Lisa Graf or Lisa Hickey of stealing his wallet. Jordan noticed that Ridling had a red mark or cut about halfway up his shin. The Detectives also noticed that appellant was guarded during the interview and that he used past tense when referring to Baskett.

Jordan attempted to schedule a second interview with Lisa for August 8, but Ridling called him and cancelled. When the officers finally did interview Lisa on August 14, 2002, Ridling accompanied her and refused to let her speak freely. When Lisa did speak, he would cut her off and interject his own comments. Ridling denied having any contact with Baskett during the week before his disappearance, claimed he stayed home all day on Sunday, August 4, 2002, until he left for work at 6:15 p.m., and when told about witness reports that he and Baskett had a confrontation on August 3, 2002, he denied the encounter.

Warrants to search Ridling's residence and for seizure of his truck were executed on August 21, 2002. While searching the shed, Detective Marc Sullivan noticed a double-bit axe that had a spattering of green paint on it. While searching the truck, Sullivan found the interior carpet wet, and when it was removed, a reddish-tinted substance was on the bottom of the truck. The preliminary test of the reddish water tested positive for blood. In addition, blood was also found on the passenger seatbelt, on the passenger's seat headrest, and on a plastic pane on the passenger side. The blood samples were sent to the State Crime Lab and some were found to be a match with that of Baskett.

On August 30, 2002, Arkansas Game and Fish Commission Officer Terry "Mickey" Rogers was working in the Hope Upland Wildlife Area, Hempstead County, when Ridling drove up in his

truck dressed in his UPS uniform. Despite that fact that it was quite still dark, between 5:45 and 6:15 a.m., Ridling was driving with only his parking lights on.

On September 27, 2002, another search of the Hope Upland Wildlife Area was conducted, and a white trash bag smelling of a decaying organism was located that afternoon. A stacked pile of branches was found that was inconsistent with the other vegetation in the area, and that had a strong odor of decay surrounding it. Because what appeared to be a bone fragment was seen, the area was thoroughly searched that same day and again on October 1, 2002. During these searches, officers found: bones and fragments of bone, which were identified as Baskett's; two sets of keys, which were later found to be to Baskett's car and house; a baseball cap, which was identified as one given to Baskett; a Chap Ice chapstick container that matched similar containers found at Baskett's home; sunglasses identified by Baskett's daughter as belonging to her father; and, a double-bit axe with a spattering of green paint on the handle.

A second search warrant for Ridling's residence was executed on October 1, 2002, after the axe was found in the woods, but the axe previously photographed at Ridling's home could not again be located.

At some point prior to the discovery of the bones, Ridling was arrested. During the time he was incarcerated in the fall of 2002, he made several admissions to another inmate, William Gainey, Jr. When Ridling learned that the officers were searching in the Hope Wildlife Area, he said that "[t]hey wouldn't find anything, but they were looking in the correct area." Ridling also told Gainey that he and Baskett "were going to the bank on that Sunday."

On October 8, 2002, an information was filed in Miller County, charging Ridling with capital felony murder and premeditated and deliberated murder. During the trial, Ridling's counsel moved for directed verdict regarding what he felt were several deficiencies in the State's case as to proof. The motion was renewed at the end of the trial and was denied.

### Territorial Jurisdiction

Ridling argues that there was positive evidence presented that Miller County did not have territorial jurisdiction, but charges should have been filed in Hempstead County. The trial court did

not err by denying Ridling's directed-verdict motion on the basis that the crime did not occur in Miller County, Arkansas.

Territorial jurisdiction over a criminal defendant is controlled by statute. *Kirwan v. State,* 351 Ark. 603, 96 S.W.3d 724 (2003). We have stated that "when reviewing the evidence on a jurisdictional question, [we] need only determine whether there is substantial evidence to support the finding of jurisdiction." *Id.; Dunham v. State,* 315 Ark. 580, 581, 868 S.W.2d 496, 497 (1994).

Our cases have consistently recognized that when a crime begins in one county and proceeds to culmination in another county, both counties have jurisdiction to prosecute the crime. *Cloird v. State,* 352 Ark. 190, 99 S.W.3d 419 (2003); *Cozzaglio v. State,* 289 Ark. 33, 709 S.W.2d 70 (1986); See also *Wilson v. State,* 298 Ark. 608, 770 S.W.2d 123 (1989) (reiterating the law that separate crimes committed in one continuous episode in more than one county may be tried in either county and require joinder in one county if the defendant requests it). In *Patterson v. State,* 306 Ark. 385, 815 S.W.2d 377 (1991), this court held that although the murder occurred in Greene County, Craighead County had jurisdiction to try the appellant because some of the acts requisite to the murder occurred in Craighead County. *See also Pilcher v. State,* 303 Ark. 335, 796 S.W.2d 845 (1990) (holding that both Saline County and Grant County had jurisdiction to try the appellant for murder, where the actual killing occurred in one county, but the acts requisite to the consummation of the murder and the subsequent disposal of the body occurred in the other county).

Ark. Code Ann. § 5-1-111(b) creates a presumption in favor of jurisdiction where the charge is actually filed by the State. *Higgins v. State,* 317 Ark. 555, 879 S.W.2d 424 (1994). Ark. Code Ann. § 5-1-111(b) states:

> (b) The state is not required to prove jurisdiction or venue unless evidence is admitted that affirmatively shows that the court lacks jurisdiction or venue.

*Findley v. State,* 307 Ark. 53, 59, 818 S.W.2d 242, 246 (1991). This presumption can be overcome if positive evidence is admitted that affirmatively shows jurisdiction to be lacking. *Nicholson v. State,* 319 Ark. 566, 892 S.W.2d 507 (1995). If such positive evidence of lack of

jurisdiction is presented, then the State must then offer evidence that jurisdiction is proper in the county where the case is being tried. *Dix v. State,* 290 Ark. 28, 715 S.W.2d 879 (1986).

Ridling contends that no evidence, direct or circumstantial, was presented that any laws were ever violated in Miller County. He asserts that based on the evidence found in Hempstead County, the burden shifted to the State to establish that territorial jurisdiction of Miller County was proper. *Dix, supra.*

■ The State presented substantial evidence that an element of the offense for which Ridling was convicted occurred in Miller County, Arkansas. Lisa testified that in response to her demand that Ridling "handle the situation" concerning Baskett, he left with a baseball bat. Seale testified that she saw Ridling's truck pull up to Baskett's house, and that Ridling and Baskett left together in that same truck. All these activities occurred in Miller County. From this evidence, the jury could logically conclude that one or more of the acts charged occurred in Miller County. Therefore, the trial court did not err in denying Ridling's directed-verdict motion on the basis of jurisdiction.

### Capital Felony Murder

Ridling challenges the sufficiency of the evidence to support a conviction of capital felony murder. According to the jury's verdict, Ridling was found guilty "of committing or attempting to commit the crime of kidnapping, and that in the course of and in furtherance of that crime or attempt or in immediate flight therefrom he caused the death of Roy Baskett, Jr. under circumstances manifesting extreme indifference to the value of human life."

■ A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Smith v. State,* 352 Ark. 92, 98 S.W.3d 433 (2003). When a defendant makes a challenge to the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the State. *Id.* Evidence, whether direct or circumstantial, is sufficient to support a conviction if it is forceful enough to compel reasonable minds to reach a conclusion one way or the other. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Hodge v. State,* 303 Ark. 375, 797 S.W.2d 432 (1990). On appeal, this court does not weigh the

evidence presented at trial, as that is a matter for the fact-finder; nor do we assess the credibility of the witnesses. *Smith, supra.*

In this case, the State was required to prove that Ridling committed or attempted to commit the underlying charge of kidnapping. In the information, the State alleged only the underlying offense of kidnapping or the attempted kidnapping to support the charge of capital felony murder. Ark. Code Ann. § 5-11-102(a)(4) states:

> (a) A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with his liberty with the purpose of:
>
> (4) Inflicting physical injury upon him, or of engaging in sexual intercourse, deviate sexual activity, or sexual contact with him

Ridling contends that the State must prove beyond a reasonable doubt (1) that he restrained Baskett without his consent, and (2) that the purpose of such restraint was to inflict physical injury upon him. Ridling cites to *Parker v. State,* 292 Ark. 421, 731 S.W.2d 756 (1987), where this court held that the State did not advance a convincing argument as to how the murder committed after a burglary could be done in the course of and in furtherance of the burglary, both of which were required elements. Therefore, Ridling avers that even if evidence of kidnapping is found, there is no such proof to establish that the death of Baskett was in the course and in furtherance of kidnapping.

However, *Parker* can be distinguished from the case at hand. Unlike burglary, a specified object of kidnapping is that it occurs with the purpose of causing physical injury. Compare Ark. Code Ann. § 5-11-102(a)(4) with Ark. Code Ann. § 5-39-201(a)(1) (Repl. 1997). Proof of kidnapping necessarily requires proof of intent to cause physical injury. In this case, the evidence showed that Ridling restrained Baskett with the purpose of injuring him and that Baskett's death occurred during the course thereof.

In *Hogan v. State,* 281 Ark. 250, 663 S.W.2d 726 (1984), Hogan was the last person seen with the victim before her car was later found abandoned. The victim's blood and clothing were found inside the car, along with Hogan's semen and fingerprints. The victim's body was later found in the Mississippi River. This

court held that there was substantial evidence that the murder occurred in the course of kidnapping and affirmed Hogan's capital murder conviction. .

■ From the evidence presented at trial, the jury could reasonably conclude that Ridling had formed the plan to lure Baskett into his vehicle, where he would be under Ridling's control and his liberty thus restrained, with the purpose of injuring or killing him, and that Baskett died under circumstances manifesting extreme indifference to the value of human life. First, Lisa testified that her husband left their home at noon with a baseball bat, saying that he was going to take care of some things. Next, Ms. Seale saw Ridling arrive at Baskett's home and saw the two leave together soon afterwards. Baskett was last seen at that time. While in jail, Ridling told Gainey that on August 4, 2002, he and Baskett were going to the bank, despite the fact that day was a Sunday. Samples of Baskett's blood were discovered in the passenger seat of Ridling's truck. Bone fragments and several personal items belonging to Baskett were discovered near Hope, an area where appellant was seen twice following Baskett's disappearance.

### Corpus Delicti

■ Ridling contends that the State failed to prove *corpus delicti*, that Baskett's death occurred as a result of a criminal act. The *corpus delicti* may be proved by circumstantial evidence, i.e., there was in fact a death and that the deceased came to his death by the criminal agency of another. *Derring v. State*, 273 Ark. 347, 619 S.W.2d 644 (1981); *Edmonds v. State*, 34 Ark. 720 (1879); and 1 Underhill's Criminal Evidence 37 (5th Ed. 1956). In 1879, this court laid out three points to be proved before *corpus delicti* could be found: (1) the fact of death; (2) that the decedent be identified as the person for which defendant had been charged with killing; and (3) criminal agency is the cause of that person's death. *Edmond, supra*. There, two medical witnesses examined the skull and rendered the opinion that the victim had received a blow to the head.

Here, Dr. Charles Kokes testified that due to the lack of remains recovered, that he was unable to determine a cause or manner of death. Dr. Kokes stated that "as a medical doctor reviewing all of the evidence, I could not conclusively say that this was a homicide."

However, circumstantial evidence provides the basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Howard v. State,* 348 Ark. 471, 79 S.W.3d 273 (2002); *Sublett v. State,* 337 Ark. 374, 989 S.W.2d 910 (1999). Such a determination is a question of fact for the fact-finder to determine. *Id.; Sheridan v. State,* 313 Ark. 23, 852 S.W.2d 772 (1993). The credibility of witnesses is an issue for the jury and not the court. *Phillips v. State,* 344 Ark. 453, 40 S.W.3d 778 (2001). The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Phillips, supra.* We will disturb the jury's determination only if the evidence did not meet the required standards, thereby leaving the jury to speculation and conjecture in reaching its verdict. *Philips, supra.* Additionally, the longstanding rule in the use of circumstantial evidence is that the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused to be substantial, and whether it does is a question for the jury. *Howard, supra; Gregory v. State,* 341 Ark. 243, 15 S.W.3d 690 (2000).

The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Howard, supra; Chapman v. State,* 343 Ark. 643, 38 S.W.3d 305 (2001). We have also held that a defendant's improbable explanation of suspicious circumstances may be admissible as proof of guilt. *Id.; Chapman, supra; Goff v. State,* 329 Ark. 513, 953 S.W.2d 38 (1997).

Here, the jury could reasonably infer that Baskett died by criminal means: the angry confrontation between Ridling and Baskett the night before he disappeared; Ridling's leaving his residence with a baseball bat and telling Lisa he was going to take care of some things; Baskett leaving his home with Ridling; Baskett's blood in Ridling's truck; the discovery of Baskett's bones in an area where Ridling was known to have been in the hours following Baskett's disappearance; and, Ridling's admission to Gainey that the police would not find anything even though they were looking in the right place. Because these facts lead to the conclusion that Ridling kidnapped and murdered Baskett, the trial court did not err in denying his motion for directed verdict.

## Marital Infidelity

Ridling argues that the introduction of marital infidelity lacked a legitimate connection to the crime charged, amounted to an attack upon his character, and resulted in prejudicial error. In evidentiary determinations, a trial court has wide discretion, and we do not reverse a ruling on the admission of evidence absent an abuse of discretion. *Bullock v. State,* 353 Ark. 577, 111 S.W.3d 380 (2003); *Davis v. State,* 350 Ark. 22, 86 S.W.3d 872 (2002). The trial court did not abuse its discretion and should be affirmed.

During cross-examination of Ridling, the State brought up the topic of marital infidelity. Ridling's counsel objected, but the trial court overruled. Ridling argues that the evidence introduced at trial had no relevance for the offense he was charged. Ridling admitted an affair, "but the State inquired into specific aspects of the affair, and how his former wife found out about it." According to Ridling, this line of questioning had nothing to do with his credibility, but amounted to "smearing" his character. *Barnett v. Commonwealth,* 763 S.W.2d 119 (Ky. 1988). Ridling asks this court to adopt the rulings from *Barnett,* a Kentucky case, and find this type of evidence, with limited exceptions, to be prejudicial.

Ridling opened the door to the topic by discussing the matter on direct examination, and he cannot later object to being cross-examined on the subject. *Newman v. State,* 353 Ark. 258, 106 S.W.3d 438. During direct examination, Ridling testified that "[o]n the afternoon of the 4th, Lisa was asking me where I'd been in a jealous way. Like a jealous wife thinking her husband was having an affair or something. . . Lisa was the other woman at one point. I felt like Lisa was suspicious of me all the time." Because Ridling brought up the issue of martial infidelity during direct examination, he cannot now complain about being cross-examined on it.

## Daubert

Ridling argues that the trial court erred in ruling that *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), has not been adopted in Arkansas, and as a result, he was prejudiced by evidence that was introduced without a proper foundation.

Bobby Humphries, latent fingerprint examiner for the Arkansas State Crime Laboratory, was declared an expert at Ridling's trial. Ridling's counsel was allowed to question Humphries under

Ark. R. Evid. 702 regarding his qualifications. Outside the presence of the jury, Humphries testified that he had previously been permitted to give similar expert testimony in courts in Arkansas and in Texas. According to Humphries, the method of photographic comparison was accepted in the scientific community, that he had personally performed the technique for six years, and that he was taught that process at the Crime Laboratory. Humphries commented that in the course of his employment he would compare actual, recovered items of evidence to items depicted in photographs. The State moved to have Humphries declared an expert, Ridling's attorney objected, and the trial court overruled the objection.

Bobby Humphries testified that pictures of an axe handle taken while conducting a search warrant at Ridling's home prior to his arrest, matched the handle of the axe that was later found at the area where Baskett's bones were found. Humphries obtained a photograph depicting the axe handle in Ridling's shed and converted it to a 1:1 scale, black and white photograph. He then took his own photograph of the axe handle found near Baskett's remains and converted it to a 1:1 scale, black and white photograph. Humphries examined each to see whether wear patterns, paint spatters, size, grain, and the like matched.

In overruling Ridling's objection, the trial court opined that although mentioned in several opinions by this court, the *Daubert* rule had not been adopted in Arkansas. Rule 702 of the Arkansas Rules on Evidence entitled "Testimony of Experts" reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The rule expressly recognizes that an expert's testimony may be based on experience in addition to knowledge and training. In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court established an inquiry to be conducted by the trial court when faced with the admissibility of certain expert testimony. In *Farm Bureau Mutual Insurance Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), this court adopted *Daubert* and held that a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the

trier of fact to understand or determine a fact in issue. *Farm Bureau Mut. Ins. Co. v. Foote, supra*. This inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* A primary factor for a trial court to consider in determining the admissibility of scientific evidence is whether the scientific theory can be or has been tested. Other factors include whether the theory has been subjected to peer review and publication, the potential error rate, and the existence and maintenance of standards controlling the technique's operation. It is also significant whether the scientific community has generally accepted the theory.

Ridling argues that the trial court never went into the *Daubert* analysis, because it was under the mistaken belief that analysis had not been adopted in Arkansas. According to Ridling, there was no scientific foundation laid, therefore his recognition as an expert put a considerable amount of weight on his opinion.

However, the technique, as the State argued, involved "the hardly novel act of examining two photographs for similarity." Moreover, the predicate for testimony concerning Humphries's examination was laid outside the jury's presence by his testimony that his technique was accepted by the scientific community, had been used by him personally for six years, had been used in this State for nearly two decades, and had been accepted as reliable by courts in this State and Texas.

The trial court did err in commenting that *Daubert* had not been adopted by Arkansas courts, however it was harmless error, and the decision overruling the objection to Humphries's testimony is affirmed.

*"Crime Scene"*

For his sixth point on appeal, Ridling argues that the use of "crime scene," improperly negates the presumption of innocence during a trial when the defense is that no crime has been proven. Ridling cites to several cases from other states where courts have dealt with the use of the word "victim," and ruled that such use is inconsistent with the presumption of innocence. *Jackson v. State,* 600 A.2d 21 (Del. 1991); *Allen v. State,* 644 A.2d 982 (Del. 1994); *Veteto v. State,* 8 S.W.3d 805 (Tex. App. 2000); *State v. Wright,* 02CA008179, 2003 WL 21509033 (Ohio App. 2003). Finally,

Ridling contends that the continual reference to the word "crime scene" was prejudicial when the jury was considering whether there was even a crime to begin with.

 Ridling did not preserve this point for appeal because he did not make a timely objection. To preserve a point for appeal, an objection must be made at the first opportunity. *Cummings v. State,* 353 Ark. 618, 110 S.W.3d 272; *Gamble v. State,* 351 Ark. 541, 95 S.W.3d 755 (2003); *Berger v. State,* 343 Ark. 413, 36 S.W.3d 286 (2000). We have stated that if a contemporaneous objection is not made during a jury trial, the proverbial bell will have been rung and the jury prejudiced. *Id.; Stewart v. State,* 332 Ark. 138, 964 S.W.2d 793 (1998).

 Here, the first opportunity to make an objection at trial was when the State was examining Marc Sullivan, who testified that he made a videotape from Interstate 30 at Hope to the crime scene at the Wildlife Management Area. He commented that the total mileage from Interstate 30 to the "crime scene" was 7.1 miles. Sullivan went on to give a more detailed instruction of the roads he took and the mileage on each of those roads. Sullivan then stated that "If you followed those directions you should end up right here. There are vehicles parked up here at the top where you enter the crime scene." Ridling's counsel then requested a bench conference where he objected to the State referring to the area as a crime scene. The trial court overruled the objection. Ridling's claim is barred because he did not object to the first use of "crime scene," but waited until after Sullivan said it again. Regardless, the admission of such a statement constitutes harmless error.

### Husband/Wife Privilege

For his final point on appeal, Ridling challenges five statements made by his wife, Lisa Graf, that were introduced over his objection. These statements are:

1. Lisa Graf questioned Ridling about whether he did anything to Baskett. Lisa told Ridling that she had told investigators some lies, specifically that they had not seen Baskett. Ridling responded by saying "that's fine. We haven't." Lisa further recalled Ridling saying, "once you tell the police something, never change your story."

2. On or about August 4, 2002, Lisa asked why Ridling's shoes were wet. Ridling responded that he went jogging, but Lisa asked several other follow-up questions.

3. When Lisa indicated that she was going to give a statement to Bobby Jordan, Ridling stated, "No, you're not. You didn't do anything wrong and they just need to leave you alone."

4. Ridling wrote a letter to Lisa, saying, "I can do better with you on my side, especially about Sunday, August 4th. You made it sound like I was gone four hours and come home guilty of something."

5. In another letter, dated November 26, 2002, Ridling wrote, "I let you influence me too much. August 3rd you went crazy, but it won't happen again."

According to Ridling, all of the communications were protected under Ark. R. Evid. 504 and do not fall under any exception. Ark. R. Evid. 504 provides in part:

(a) *Definition.* A communication is confidential if it is made privately by any person to his or her spouse and is not intended for disclosure to any other person.

(b) *General Rule of Privilege.* An accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the spouse.

██ Statements made by one spouse to the other that are for the purpose of establishing an alibi are intended for publication to investigators and are not confidential. *Findley v. State,* 307 Ark. 53, 818 S.W.2d 242 (1991). A spouse's direction to another spouse to communicate a fabricated story to the police is intended for disclosure to a third-party and, hence, is not a privileged communication. *David v. State,* 286 Ark. 205, 691 S.W.2d 133 (1985).

██ In this case, the trial court did not abuse its discretion by overruling Ridling's objection to the above statements and the comments contained in the letters. The statements were intended for Lisa to fabricate a story, to continue the fabrication, or to establish an alibi. The statements were not privileged.

*Rule 4-3(h)*

In compliance with Ark .Sup. Ct. R. 4-3(h), the record has been examined for adverse rulings objected to by Ridling but not argued on appeal and no prejudicial error is found.

In view of the physical and substantial circumstantial evidence presented to the jury, who determined his guilt and recommended his sentence, we cannot say that the trial court committed error in this case. Accordingly, we find no reversible error in the trial court's rulings.

Affirmed.

CORBIN, J., not participating.