Cite as 2019 Ark. 323

# SUPREME COURT OF ARKANSAS

No. CR–18–1029

| | | |
|---|---|---|
| TRAVIS PRICE | | **Opinion Delivered:** November 14, 2019 |
| | APPELLANT | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. 35CR-16-253] |
| V. | | |
| STATE OF ARKANSAS | APPELLEE | HONORABLE ALEX GUYNN, JUDGE |
| | | <u>AFFIRMED</u>. |

**JOHN DAN KEMP, Chief Justice**

Appellant Travis Price appeals an order of the Jefferson County Circuit Court convicting him of first-degree felony murder, two counts of aggravated robbery, and a firearm enhancement and sentencing him as a habitual offender to life imprisonment. For reversal, Price argues that the circuit court erred in denying his motions for directed verdict, sentencing him illegally, and denying his motion to suppress. We affirm.

## I. *Facts*

Officer Christopher Sweeney of the Pine Bluff Police Department testified that, around midnight on May 14, 2016, he responded to a call involving a shooting at a Pine Bluff residence. When he arrived at the scene, the officer witnessed a man later identified as Jason Tyler carrying a red gaming table out of the home. Officer Sweeney entered the residence and found a man named Mason Foster sitting in a chair. He also found the victim, Andre Eason, unresponsive and lying on the floor. Dr. Adam Craig, a forensic pathologist

at the Arkansas State Crime Laboratory, testified that Eason died from a gunshot wound that entered the left shoulder area, traveled through the body, and lodged in his pelvic bone.

Five eyewitnesses testified at trial. Foster testified that several friends gathered for a barbeque at his home and started shooting dice around 10:00 p.m. Foster stated that Price and "two younger guys" came to his home "ready to gamble." Foster stated that Price lost his money, and he and his two friends walked out the back door but returned five minutes later. According to Foster, Price reentered the room, pointed a gun at Foster's face, and said to "drop it, old school." Foster said that he dropped his money, which totaled approximately $1000, and Price lowered the gun. Foster slowly walked toward the bathroom, heard seven or eight shots, heard the backdoor slam, and emerged from the bathroom. Foster witnessed Price and the two men leave in a black Altima with a Texas license plate. Foster also testified that he saw Eason lying on the floor.

Tyler testified that he arrived at Foster's home around 11:00 p.m. on May 13, 2016. He testified that he and other individuals gambled and played dice that evening but that he lost his money. Tyler stated that he later heard shots, "balled up on the couch," and heard someone yell to get down. Tyler stated that he dropped his money and did not see who asked for it. Tyler further stated that he and Anthony Luckett ran out the front door and remained outside.

E.L. Surratt testified that he remembered drinking, shooting dice, and gambling at Mason's duplex until approximately 1:00 a.m. that evening. Surratt stated that he remembered gambling with a man by the street name of "Red" or "Red Nose." Surratt testified that "[t]he one I was gambling with" left, and "he wasn't out too long before he

2

came back in." Surratt said that when the man returned, he shot his gun "in a seat or couch or something" but was not aiming at anyone. When he heard the shot, Surratt jumped up, got pushed, and fell to the floor. Surratt witnessed Foster pick up the table, and "they scuffled over" it. According to Surratt, more shots were fired in the house, and one of the men who "robbed the place" took his money.

Anthony Luckett testified that he went to Foster's home and recalled Price needing Foster to loan him $150. Luckett stated that Price asked him to intervene. Luckett testified that when he heard shots, he ran out the door and two blocks down the street. Luckett stated that he never saw Price with a gun, but he saw another man at the scene with a gun in his pocket.

Jesse Pridgeon, Foster's brother-in-law, testified that he saw Price "standing around and gambling" that evening. Pridgeon stated that Price "had two young guys with him." He testified that when he walked out of the bathroom, he saw Price "cock a gun," turn around, fire a couple of shots in the house, and say, "All you mother fuckers on the floor." Pridgeon testified that he ran into a back bedroom where Price could not see him. While he hid in the bedroom, Pridgeon heard five or six shots, heard someone say "someone got hit," and heard people "running everywhere and stuff."

Detective Keith Banks of the Pine Bluff Police Department testified that he received a call to investigate a possible homicide at approximately 1:00 a.m. When the detective arrived, he met the five eyewitnesses—Foster, Tyler, Surratt, Luckett, and Pridgeon—and interviewed them at the scene. Detective Banks testified that Price was subsequently arrested, taken into custody, and interviewed. During the detective's testimony, the State

3

played for the jury Price's recorded interview during which he denied his involvement in the murder but admitted his presence at Foster's home that night.

On May 11, 2018, the State charged Price with one count of capital murder, six counts of aggravated robbery, felon in possession of a firearm, and two sentencing enhancements. A Jefferson County Circuit Court jury convicted Price of first-degree felony murder, two counts of aggravated robbery against Foster and Surratt, and a felon-in possession-of-a-firearm enhancement. The circuit court sentenced him as a habitual offender to a term of life imprisonment for the first-degree murder conviction and two terms of life imprisonment for the aggravated-robbery convictions. On May 24, 2018, the circuit court entered its sentencing order. From this order, Price timely appealed.

II. *Motions for Directed Verdict*

On appeal, Price argues that the circuit court erred in denying his motion for directed verdict because substantial evidence does not support the first-degree-murder conviction and one of the aggravated-robbery convictions.

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Gillard v. State*, 372 Ark. 98, 270 S.W.3d 836 (2008). In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.*, 270 S.W.3d 836. We affirm a conviction if substantial evidence exists to support it. *Id.*, 270 S.W.3d 836. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Navarro v. State*, 371 Ark. 179, 264 S.W.3d 530 (2007).

4

Price's criminal liability is based on his status as an accomplice. Under accomplice liability, "[a] person may commit an offense either by his or her own conduct or that of another person." Ark. Code Ann. § 5-2-401 (Repl. 2013). "A person is criminally liable for the conduct of another person if . . . [t]he person is an accomplice of another person in the commission of an offense[.]" Ark. Code Ann. § 5-2-402(2) (Repl. 2013). A person is an accomplice of another person if, with the purpose of promoting or facilitating the commission of the offense, he or she solicits, advises, encourages, coerces, aids, agrees to aid, or attempts to aid in planning or committing the offense. Ark. Code Ann. § 5-2-403(a)(1)–(2) (Repl. 2013).

When a theory of accomplice liability is implicated, we affirm the circuit court's order in a sufficiency-of-the-evidence challenge if substantial evidence exists to show that the defendant acted as an accomplice in the commission of the alleged offense. *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002). We have said that there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Id.*, 86 S.W.3d 916. When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id.*, 86 S.W.3d 916. One cannot disclaim accomplice liability simply because he or she did not personally take part in every act that went to make up the crime as a whole. *Id.*, 86 S.W.3d 916.

## A. First-Degree Murder

Price argues that the evidence was not sufficient to support his first-degree murder conviction and specifically contends that the eyewitnesses failed to provide any testimony about seeing the victim get shot or who shot him.

The felony-murder statute provides,

> (a) A person commits murder in the first degree if:
>
> (1) Acting alone or with one (1) or more other persons:
>
> (A) The person commits or attempts to commit a felony; and
>
> (B) In the course of and in furtherance of the felony or in immediate flight from the felony, the person or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life[.]

Ark. Code Ann. § 5-10-102(a)(1) (Repl. 2013).

Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Cluck v. State*, 365 Ark. 166, 226 S.W.3d 780 (2006). Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.*, 226 S.W.3d 780. The weight of the evidence and the credibility of the witnesses are matters for the fact-finder, not for this court on appeal. *Ridling v. State*, 360 Ark. 424, 203 S.W.3d 63 (2005). The jury may believe all or part of any witness's testimony and is responsible for resolving questions of conflicting testimony and inconsistent evidence. *Id.*, 203 S.W.3d 63. A criminal defendant's intent or state of mind is rarely capable of proof by direct evidence and most often is inferred from the circumstances of the crime. *Steggall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000). A jury is not required to believe all or any part of a defendant's or witness's statement and is entitled to draw upon common sense and experience in reaching its verdict. *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996).

Here, the State presented substantial evidence that supports Price's first-degree felony-murder conviction. Five eyewitnesses testified that Price and two younger men went

to Foster's home to gamble. There, Price lost his money, went outside with his two associates, returned to the gambling table inside the house, pointed his gun at Foster, demanded money, shot rounds inside the house, and yelled at everyone to hit the floor. These witnesses heard multiple gunshots and saw the men flee the scene. Officer Sweeney arrived and found the victim lying unresponsive on the floor. In short, the jury heard evidence that Price facilitated, encouraged, and participated in Eason's murder during the course of the aggravated robbery that evening at the gambling house. Viewing the evidence in a light most favorable to the State and giving deference to the jury's findings on the witnesses' credibility, we hold that substantial evidence supported Price's first-degree felony-murder conviction.

## B. Aggravated Robbery

Price also challenges his conviction for aggravated robbery against Surratt and asserts that the State failed to prove that either he or his accomplice had stolen money from Surratt on the night of the murder.

A person commits aggravated robbery if he or she commits robbery as defined by Arkansas Code Annotated section 5-12-102 (Repl. 2013), and the person (1) is armed with a deadly weapon; (2) represents by word or conduct that he or she is armed with a deadly weapon; or (3) inflicts or attempts to inflict death or serious physical injury upon another person. Ark. Code Ann. § 5-12-103(a) (Repl. 2013). "A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person." Ark. Code Ann. §

7

5-12-102(a) (Repl. 2013). Theft occurs if a person knowingly "(1) [t]akes or exercises unauthorized control over or makes an unauthorized transfer of an interest in the property of another person with the purpose of depriving the owner of the property; or (2) [o]btains the property of another person by deception or by threat with the purpose of depriving the owner of the property." Ark. Code Ann. § 5-36-103(a) (Repl. 2013).

Here, Surratt's testimony itself provides substantial evidence to support Price's aggravated-robbery conviction. Surratt testified that he arrived at Foster's duplex at approximately 1:00 a.m. and recalled seeing a man with the nickname of "Red" or "Red Nose." He testified that Red went outside, returned, and fired a shot at the couch. Surratt remembered that the "the second one," Red's friend, demanded money from him. Surratt admitted that he could not identify Price as Red or who had fired the shots. Nevertheless, the testimony adduced at trial demonstrates that Price and an accomplice stole money from Surratt, were armed with a deadly weapon, and inflicted death upon the victim. Thus, under an accomplice-liability theory, we hold that substantial evidence supported Price's aggravated-robbery conviction.

III. *Illegal Sentence*

Next, Price argues that the circuit court erred by sentencing him as a habitual offender to a term of life imprisonment, pursuant to Arkansas Code Annotated section 5-4-501(d)(1) (Supp. 2017), because he had two prior convictions for crimes that he had committed as a minor. Price committed residential burglary at age seventeen and aggravated robbery at age sixteen. In both instances, he was tried as an adult. Price now contends that

8

his sentence is illegal and violates his Eighth Amendment rights because the two convictions for the crimes that he committed as a juvenile cannot now be used to confer a life sentence.

In *Wilson v. State*, 2017 Ark. 217, 521 S.W.3d 123, we affirmed Wilson's sentence as a statutorily mandated term of life imprisonment as a defendant who had been convicted of aggravated robbery and had previously been convicted as an adult of two felonies involving violence. In *Wilson*, we recognized the following line of landmark cases from the Supreme Court of the United States:

> In support of his contention, Wilson cites to *Miller v. Alabama*, 567 U.S. 460, 465 (2012), which held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *See also Graham v. Florida*, 560 U.S. 48, 80 (2010) (holding that the Eighth Amendment prohibits a sentence of life without parole for juveniles convicted of nonhomicide offenses); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding that imposing the death penalty on juveniles violates the Eighth Amendment). In *Miller*, the Court observed that children are constitutionally different from adults for purposes of sentencing because juveniles have diminished culpability and greater prospects for reform and are thus less deserving of the most severe punishments. *Miller*, 567 U.S. at 471–72. The Court further observed that mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features. *Id.* at 478. The Court concluded that the "Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," because by "making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at 479.

*Wilson*, 2017 Ark. 217, at 6–7, 521 S.W.3d at 127. Ultimately, we held that a conviction imposed on a juvenile sentenced as an adult may be used as the basis for an increased penalty imposed under the habitual-offender statute. *Id.* at 8, 521 S.W.3d at 128.

In the case at bar, Price committed two prior violent felonies as a minor but was tried as an adult. The State introduced the two judgment-and-commitment orders reflecting

9

these two convictions, and the circuit court sentenced him on this basis. Based on our holding in *Wilson*, 2017 Ark. 217, 521 S.W.3d 123, we conclude that the circuit court did not err in admitting these two prior convictions when considering his status as a habitual offender. Further, the record reveals that, at sentencing, both parties acknowledged that Price would receive an automatic life sentence for being a "three striker" pursuant to section 5-4-501(d)(1).[1] Therefore, we conclude that the circuit court properly admitted the evidence of Price's two prior convictions at sentencing.

IV. *Motion to Suppress*

For the last point on appeal, Price argues that the circuit court erred in denying his motion to suppress and that the admission of his statement violates his rights pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Specifically, Price contends that the circuit court erred in allowing the jury to hear a portion of his taped statement during which he requested an attorney and then an officer terminating the interview. Price asserts that the circuit court abused its discretion in refusing to redact that portion of his statement to police.

Prior to trial, Price filed a motion to suppress a statement made during his custodial interrogation by the Pine Bluff Police Department. On May 15, 2018, the circuit court held a hearing on Price's motion to suppress. Detective Banks testified that he met Price at the Pulaski County Detention Center, Mirandized him, took a statement, and recorded the

---

[1]At sentencing, Price also made an ex post facto argument but abandoned that argument on appeal. *See Chambers v. State*, 2012 Ark. 407, 424 S.W.3d 296 (arguments raised below but not on appeal are considered abandoned).

interview. Toward the end of the interview, the following colloquy occurred between Detective Banks and Price:

DETECTIVE BANKS:    How did you get to Little Rock?

PRICE:    I had—let me see, man. I just need—I want to [sic] my lawyer cause I see—I don't know want to implement nobody in this cause they didn't know, man. You know what I'm saying. They didn't know.

DETECTIVE BANKS:    All right. The time is 18:10. This concludes the interview.

During Banks's testimony, the circuit court admitted into evidence the recorded interview with Price and the *Miranda*-rights form that Price signed during the interview. Banks testified that Price did not appear to be intoxicated or under the influence of any drugs and that he did not threaten or coerce Price in any way. The court also admitted into evidence a *Miranda*-rights form that Price had signed. At the conclusion of the hearing, the circuit court denied his motion to suppress the statement.

Prior to trial, Price moved the circuit court to redact a portion of his statement, stating, "In [Price's] statement at the end, . . . he invokes his right to have an attorney. And I believe that's a comment [the detective terminating the interview] on [his] right to invoke his [F]ifth [A]mendment right." The State responded, "[Price] could stop questioning at any time and have a lawyer. And that's exactly what he did." The circuit court denied the motion to redact portions of the statement. At trial, Price renewed his motion, which the circuit court denied.

While Price couches the argument as a suppression issue, it actually involves the circuit court's decision to redact a portion of Price's taped statement. The decision to admit

or exclude evidence is within the sound discretion of the circuit court, and we will not reverse a circuit court's decision regarding the admission of evidence absent a manifest abuse of discretion. *MacKool v. State*, 365 Ark. 416, 443, 231 S.W.3d 676, 697 (2006) (citing *Rollins v. State*, 362 Ark. 279, 208 S.W.3d 215 (2005)).

In this instance, Price requested an attorney and exercised his right to remain silent, which the detective acknowledged by terminating the interview. We find no prejudice in this instance, and absent a showing of prejudice, we will not reverse. *See MacKool*, 365 Ark. 416, 231 S.W.3d 676. Thus, we hold that the circuit court properly denied Price's motion to suppress his statement. Accordingly, we affirm.

V. *Rule 4-3(i)*

Because Price received a life sentence, this court, in compliance with Arkansas Supreme Court Rule 4-3(i) (2019), has examined the record for all objections, motions, and requests made by either party that were decided adversely to Price. No prejudicial error has been found. We therefore affirm.

Affirmed.

HART, J., dissents.

**JOSEPHINE LINKER HART, Justice, dissenting.** Evidence of a defendant's decision to exercise his *Miranda* rights should not be part of the prosecution's case-in-chief. For this reason, I would reverse Price's conviction and remand for a new trial.

Over half a century ago, the Supreme Court of the United States decided *Miranda v. Arizona*, 384 U.S. 436 (1966). There, the Court held that certain rights afforded to the

accused by the United States Constitution are so important that authorities must apprise the accused of those rights before subjecting him or her to a custodial interrogation:

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his *right of silence* and to assure that *the exercise of the right will be scrupulously honored*, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that *he has the right to the presence of an attorney*, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda*, 384 U.S. at 478–79 (emphasis added).

Since *Miranda*, the Supreme Court has held that the prosecution may not use one's decision to exercise his or her *Miranda* rights as evidence against that person at trial. "Implicit" within the *Miranda* warnings is that exercising the right to silence "will carry no penalty." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Prosecutorial tactics aiming to draw the jury's attention to a defendant's decision not to engage with those who would interrogate him are inherently prejudicial. "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is *insolubly ambiguous* because of what the State is required to advise the person arrested." *Doyle*, 426 U.S. at 617 (emphasis added) (reversing for new trial where prosecutor sought to impeach

13

defendant's testimony at trial by questioning why defendant had not given exculpatory information to the officers who arrested and interrogated him).

As far as the right-to-silence issue, this case is even more troubling than *Doyle*. There, the attorneys for the State of Ohio were only arguing that a prosecutor should be able to use a defendant's pre-trial invocation of his *Miranda* rights for impeachment purposes during the defendant's cross-examination. 426 U.S. at 617 ("Thus, although *the State does not suggest petitioners' silence could be used as evidence of guilt*, it contends that the need to present to the jury all information relevant to the truth of petitioners' exculpatory story fully justifies the cross-examination that is at issue.") (emphasis added). Despite the State of Ohio's arguments to the contrary, the Supreme Court concluded that the prosecutor's opportunity for cross-examination does not outweigh the due process guarantees of *Miranda*. *Id*. ("Despite the importance of cross-examination, we have concluded that the Miranda decision compels rejection of the State's position."). But while the attorneys for the State of Ohio in *Doyle* were not willing to go so far as to argue that a prosecutor should be allowed to use the exercise of one's *Miranda* rights as *evidence of guilt*, that is precisely what happened here in Price's case.

The State did not use Price's decision to stop the interview and speak with his attorney for impeachment purposes on cross-examination; the prosecution presented this evidence during *its case-in-chief*. Not only was the prosecution allowed to play Price's recorded interview with Detective Banks in its entirety (including the end where Price invokes his *Miranda* rights), but the prosecutor continued to draw attention to Price's *Miranda* invocation during Detective Banks's direct examination:

14

PROSECUTOR: Okay. I noted that you shut down that interview fairly quickly. What was the reason for that?

DETECTIVE: He requests his attorney.

. . .

PROSECUTOR: Okay. And he never did explain how he got to Little Rock?

DETECTIVE: No. He—like I say, he requested his attorney, so I stopped it right there.

R. 618.

The prejudice is plain. The State used Price's decision to exercise his constitutional rights as inculpatory evidence—consciousness of guilt, an effort to limit the investigation, etc. The only logical basis for drawing attention to these circumstances was to give the jury the impression that Price was guilty of something; otherwise, why did Price not simply answer the detective's questions? The charges at issue here are serious, but the testimony and evidence offered to satisfy the necessary elements for those charges was disputed. Moreover, the rights of the State in criminal prosecutions are limited by the rights guaranteed to citizens by the Constitution. Parading Price's invocation of his constitutional rights before the jury to create an inference of guilt deprived Price of a fair trial, and this error cannot be considered harmless.

I dissent.

*Bill Luppen*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.