Robert L. FLIPPO Jr. and
Robert M. FLIPPO *v.* STATE of Arkansas

CR 75-7                               523 S.W. 2d 390

Opinion delivered June 2, 1975

*Jack L. Lessenberry*, for appellants.

*Jim Guy Tucker*, Atty. Gen., by: *Gary Isbell*, Asst. Atty. Gen., for appellee.

FRANK HOLT, Justice. A jury found appellants guilty of involuntary manslaughter. Ark. Stat. Ann. § 41-2209 (Repl. 1964). The punishment of each was assessed at a one year suspended sentence in the State Department of Correction and fines of $100. The sole issue upon appeal is the sufficiency of the evidence to sustain the verdicts. Appellants recognize that in determining the sufficiency of the evidence, upon appellate review, it is only necessary to ascertain that evidence which is most favorable to the appellee and if any substantial evidence exists, then we must affirm. *Williams* v. *State*, 257 Ark. 8, 513 S.W. 2d 793 (1974).

The appellants, Robert L. Flippo, Jr., and Robert M. Flippo, are respectively father and son. Late in the afternoon of the tragic occurrence, the father drove his son, Bobby, and the son's teenage friend, Terry Dunlap, to a clover field several miles from their home for the purpose of discovering deer tracks in preparation for the forthcoming hunting season. Among other weapons, Bobby, a college student, took a new 30.06 rifle with him. Mr. Flippo stopped the truck in the field and the two youths got out. Bobby took his rifle with him thinking he might see a deer. After walking about 150 yards, Bobby raised the rifle, which was equipped with a telescopic sight, and fired once thinking he saw a deer. The weather conditions impaired visibility since it was overcast and approaching nightfall.

About a minute later, Bobby returned to the truck and expressed his belief that he had killed a deer which he heard "bay." Terry, however, said he heard three small caliber rifle

shots, which were later determined to be distress signals. After approximately ten minutes, Bobby convinced his father to return to the scene and search for the deer. Bobby and Terry found Roy Ralph Sharp approximately 140 yards from where Bobby fired his rifle in the direction of the victim. There was evidence that the victim was partially obscured by a tree with low branches from which the bullet ricocheted. The victim was conscious and asking for help. He was a "big man," weighing 225 pounds, and he left leg was "almost off at the hip." He had "drug" himself approximately twenty paces out of the woods. Bobby administered no first aid although there was evidence that he had won a "National 4-H Safetyman" award based upon his knowledge of "all aspects of safety." He and Terry ran to a nearby residence, which happened to be the residence of the victim's 72 year old father. There they told Mr. Sharp that they had found a person who was wounded. The boys returned to the Flippo truck where they told Mr. Flippo about the accident. Bobby then told his father than Mr. Sharp was going to follow them back to the scene of the accident. When they arrived near the scene, Mr. Flippo and Bobby told Mr. Sharp that they were going to call an ambulance. Bobby gave Mr. Sharp directions as to the location of the victim. There was no offer of assistance to Mr. Sharp in removing the victim in one of the trucks for medical aid. After they had left, Mr. Sharp found the victim and then learned that he was his son. He asked his father to get assistance. Mr. Sharp told him "[S]on, some folks have gone to call an ambulance. You lay right still and it will be here in just a few minutes."

The Flippos left and drove to the Flippo home which was twelve or fourteen miles away. Mr. Flippo, who was told by Terry that the victim's leg was nearly severed, drove past numerous houses, some of which had telephones, and a cafe, which was only 2.3 miles from the wounded man. The cafe was open and an outside public telephone was plainly visible. Mr. Flippo stopped once at a residence to use a phone at Bobby's suggestion and when the motor almost stopped, they continued on to the Flippo residence where they were certain there would not be a party line. "[T]here was conversation about removing the rifle from the truck so nobody would know we had the rifle and was hunting out of season." At Mr.

Flippo's direction, after reaching the residence, Bobby and Terry switched the high powered rifle and another rifle from the truck to a "shack" for a shotgun, which was placed on the gun rack in the truck. Then, Mr. Flippo called an ambulance which met him approximately 25 minutes later at the cafe, which he had passed en route to his residence. While Mr. Flippo waited at the restaurant for the ambulance, Terry and Bobby returned in the Flippo truck to the scene where they assisted Mr. Sharp in placing his son in the Sharp truck. A short distance down the road, they met the ambulance to which the victim was transferred. It appears Roy Sharp died either shortly before or after he was placed in the ambulance.

After giving up on the Flippos, Mr. Sharp left his son in the field and found someone at a nearby residence, who then had a neighbor call an ambulance. Mr. Sharp was only away from his son about four minutes. He further testified that from the time he found his son and Bobby and Terry returned, it was about forty minutes to an hour and fifteen minutes.

A pathologist testified that the victim bled to death, and it is possible that the victim "could have been saved" if he had been hospitalized while still conscious. He testified there were other things that could have possibly saved his life: i.e., "the quicker you get a person in the better their chances of living;" "if a shirt or anything had been put around the body, the thigh, above that point that would have stopped the bleeding." It was his opinion "[T]hat had proper treatment been initiated immediately at the site, he could have been saved."

Ark. Stat. Ann. § 41-2209 (Repl. 1964), which defines involuntary manslaughter, reads:

> If the killing be in the commission of an unlawful act, without malice,, and without the means calculated to produce death, or in the prosecution of a lawful act, done without due caution and circumspection, it shall be manslaughter.

In *State v. Green,* 38 Wn. 2d 240, 229 P. 2d 318 (1951), the court affirmed a manslaughter conviction where a hunter

fired at what he thought was a bear. There the shooter was not sure of his target. The court held that the prosecution made a prima facie case of criminal responsibility from which the jury could find the appellant guilty. See also *Johnson* v. *Commonwealth*, 308 Ky. 709, 215 S.W. 2d 838 (1948). In the case at bar, there is substantial evidence, when viewed most favorably to the appellee, from which the jury could find that Bobby, who was hunting out of season, was criminally negligent by acting without due caution and circumspection when he fired at an object he mistakely believed to be a deer and then failed, as charged, to discharge his duty, as hereinafter discussed, to render aid.

A more difficult question is presented with respect to Mr. Flippo. He, as a parent, cannot be deemed an accessory after the fact in the circumstances here. Ark. Stat. Ann. § 41-121 (Repl. 1964). The cases cited by appellee that appellant was an active participant in the tragic shooting are distinguishable. Those cases involve the owner of a car or truck who allows another to knowingly drive in a culpably negligent manner under the owner's direction and control. In this case, Bobby, a college student who is knowledgeable in gun safety, cannot be said to have been within his father's control. Neither did Mr. Flippo acquiesce in the culpable manner in which Bobby fired. Bobby was out of and away from the truck.

However, the state alleged and presented evidence to the jury that Mr. Flippo and his son had a duty to render aid to the wounded man, upon disovering him, and failed to do so causing death. "For criminal liability to be based upon a failure to act it must be found that there was a duty to act - a legal duty and not simply a moral duty." Lefave & Scott, Criminal Law 183 (1972). If the omission to act was intentional, but without the intention or expectation of fatality, the crime would be involuntary manslaughter because of criminal negligence. Perkins on Criminal Law 603 (2d Ed. 1969). In *Jones* v. *United States*, 308 F. 2d 307 (1962), the court said:

There are at least four situations in which the failure to act may constitute breach of legal duty. One can be held

criminally liable: first, where a statute imposes a duty to care for another; second, where one stands in a certain status relationship to another; third, where one has assumed a contractual duty to care for another; and fourth, *where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid.* (Emphasis added.)

See also 40 Am. Jur. 2d, Homicide § 90, and *King v. Commonwealth,* 285 Ky. 654, 148 S.W. 2d 1044 (1941). The case at bar presents a classic fact situation as to the latter situation in *Jones v. U.S., supra.* Mr. Flippo assured the victim's elderly father that he would call for an ambulance. The father kept vigil and delayed seeking assistance in the belief assistance would be procured promptly by appellants. In the meantime the victim, known by the appellants to be seriously wounded, was bleeding to death, asking his father not to leave him after being assured assistance was forthcoming. During this time, Mr. Flippo drove twelve to fourteen miles to reach his residence although phones were in the vicinity of the shooting. A public phone, which the appellants passed, was 2.3 miles from the scene of the tragedy. Mr. Flippo was told that the victim's leg was "nearly blown off." Upon reaching his home he instructed the youths to place the rifles in a "shack" and substitute a shotgun and then used his phone to call an ambulance. According to Mr. Sharp, after waiting in vain for prompt assistance, within four minutes he was able to have someone at a nearby residence summon aid. There was medical evidence that if help had arrived sooner or if aid had been administered at the site by appellants, it was probable that the victim would have survived. The jury could infer that Mr. Flippo's delay caused the helpless victim to be secluded in the field awaiting the promised aid and prevented or hindered others from rending timely aid. When we view the evidence most favorable to the appellee, as we must do on appeal, there is substantial evidence from which a jury could find appellants criminally negligent.

Affirmed.

· BROWN and FOGLEMAN, JJ., dissent as to the affirmance with respect to Robert L. Flippo, Jr.