Bryant S. WOODS *v.* STATE of Arkansas

CR 05-195                                                    213 S.W.3d 627

Supreme Court of Arkansas
Opinion delivered September 22, 2005

*Baxter, Jensen, Young & Houston*, by: *Brent Houston*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Appellant Bryant Woods was charged with the capital murder of Aaron Lovelace under both Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997) (felony murder) and § 5-10-101(a)(4) (Repl.1997) (premeditated and deliberated murder). On appeal, he challenges the sufficiency of the evidence supporting his capital murder conviction and the introduction of autopsy photographs.

In his first point on appeal, Bryant asserts that there was insufficient evidence to support his conviction for capital felony murder under § 5-10-101(a)(1), under which the State charged him with committing a murder in the course of and in furtherance of committing an aggravated robbery. Under the capital felony murder statute, the State must first prove the felony, so the felony becomes an element of the murder charge. *See Meadows v. State*, 360 Ark. 5, 199 S.W.3d 634 (2004); *Williams v. State*, 347 Ark. 728, 67 S.W.3d 548 (2002). Here, the jury acquitted Bryant on the aggravated robbery charges, and when a jury acquits a defendant on the underlying felony charge, that finding removed the robbery charge from the capital murder charge set forth in the State's information." *See Hill v. State*, 303 Ark. 462, 798 S.W.2d 65 (1990). Because the jury found the evidence insufficient to support the capital felony murder conviction, Bryant prevails on this point.[1]

---

[1] In its brief, the State appears to have premised its argument on the underlying felony in this case being delivery of a controlled substance. However, although the original

However, we find no such error with respect to Bryant's second point on appeal, wherein he argues that the trial court should have granted his motion for directed verdict with respect to the charge of premeditated and deliberated capital murder. A motion for directed verdict is a challenge to the sufficiency of the evidence. *Ridling v. State*, 360 Ark. 424, 203 S.W.3d 63 (2005); *Smith v. State*, 352 Ark. 92, 98 S.W.3d 433 (2003). When a defendant makes a challenge to the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the State. *Ridling, supra*. Evidence, whether direct or circumstantial, is sufficient to support a conviction if it is forceful enough to compel reasonable minds to reach a conclusion one way or the other. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Hodge v. State*, 303 Ark. 375, 797 S.W.2d 432 (1990). On appeal, this court does not weigh the evidence presented at trial, as that is a matter for the fact-finder, nor do we assess the credibility of the witnesses. *Smith, supra*.

In Arkansas, a person commits capital murder if, "[w]ith the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person." Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997); *see also Barrett v. State*, 354 Ark. 187, 119 S.W.3d 485 (2003). This court has held that a criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Fairchild v. State*, 349 Ark. 147, 76 S.W.3d 884 (2002); *Leaks v. State*, 345 Ark. 182, 45 S.W.3d 363 (2001). The premeditation necessary to be convicted of capital murder in Arkansas need not exist for a particular length of time. *Sanders v. State*, 340 Ark. 163, 8 S.W.3d 520 (2000). Indeed, premeditation may be formed in an instant and is rarely capable of proof by direct evidence, but must usually be inferred from the circumstances of the crime. *Id.* Similarly, premeditation and deliberation may be inferred from the type and character of the weapon, the manner in which the weapon was used, the nature, extent, and location of the wounds, and the accused's conduct. *Id.*

information charged delivery of a controlled substance as the underlying felony, the prosecutor filed an amended information changing the predicate felony to aggravated robbery.

In this case, the State alleged that Bryant was an accomplice to the capital murder of Aaron Lovelace; at trial, the State conceded that Bryant's half-brother, Dwain Woods, was the actual shooter. A person is an accomplice of another in the commission of an offense if, "with the purpose of promoting or facilitating the commission of the offense, he aids, agrees to aid, or attempts to aid the other person in committing it." Ark. Code Ann. § 5-2-403(a)(2) (Repl. 1997); *see also Williams v. State*, 351 Ark. 215, 91 S.W.3d 54 (2002).

The State's evidence at trial unfolded as follows: According to witness Delkendrick Holmes, on December 19, 2003, Aaron and Delkendrick drove together to a house on Standish Road in the Western Hills neighborhood of Little Rock to deliver a quantity of marijuana. When they got there, Aaron got out of the car with a package of marijuana and began walking toward the garage of the house; Delkendrick waited in the car.

At nearly the same time, a second car pulled up in front of the house. Two men — Broderick Bearfield and Shawn Burton — got out of that car and also began walking toward the house. As Aaron approached the house and began to talk to Bryant, Delkendrick heard Bryant tell Broderick and Shawn that Bryant's brother, Juelius Bealer, whom they had come to see, was not home. Delkendrick testified that it appeared that Bryant was trying to rush Broderick and Shawn off. Delkendrick further stated that Aaron said that he didn't have time to waste at Bryant's house, but Bryant attempted to persuade Aaron to wait, saying that Bryant's uncle was coming to meet Aaron.

By this time, Broderick and Shawn had left. Delkendrick saw Aaron go inside the garage, and then, about five minutes later, Bryant came outside and told Delkendrick that Aaron was inside using the bathroom, and that Aaron had suggested that Delkendrick come inside as well. Delkendrick got out of the car and walked up to the house, but as he entered the front door, he saw Dwain hiding in the kitchen. This unnerved Delkendrick, so he went back outside. Bryant followed him outside, and Delkendrick accused Bryant of trying to "set up" Aaron and Delkendrick. Delkendrick got in the car, and Bryant did likewise, sitting in the front seat. Delkendrick then got out of the car and placed a call on his cell phone; when he looked up, he saw Bryant coming out of

the car holding a gun. Delkendrick ran down the street, and Bryant followed him, eventually shooting him in the shoulder.

Shawn Burton testified that he and Broderick Bearfield went to the house on Standish, where they saw Aaron drive up and get out of his car. Shawn, who was looking for Bryant's brother Juelius, stated that Bryant was "acting kind of strange." For example, when Shawn asked where Juelius was, Bryant over-emphatically denied that Juelius was there, saying things such as, "I swear to God I don't know where he is," and "I promise I don't know where he is." Bryant also told Shawn that Juelius was with a friend named Chris, but shortly after Bryant said this, Chris pulled up in front of the house without Juelius. Shawn stated he felt that Bryant was trying to get him and Broderick to leave.

Shawn further stated that Aaron asked what was going on; Bryant told him to go inside and sit on the couch, and Bryant would be right in. Aaron did not appear to want to go into the house, but Bryant put his arm around his neck and pushed Aaron in the garage. According to Shawn, Aaron did not appear willing to go inside the house, and Bryant forced Aaron in. Bryant then pulled the garage door down behind him. Before Aaron went inside, however, Shawn heard him say, "I don't care who owes me money or nothing. Can we get this out [of] the way?" Shawn stated that he believed Juelius owed Aaron an amount of money.

Juelius Bealer testified that he was a friend of Aaron's, and he knew that Aaron dealt drugs to Bryant. On the day of the murder, Juelius came home from work around 2:30 in the afternoon. His friend Chris Broadnax dropped him off, and Juelius stated that Chris was going to come back later to pick him up again to go to a party at a local motel. When Juelius went in the house, Bryant and Dwain were inside, which Juelius thought was strange because of the time of the day. As Juelius was upstairs getting ready, he saw Broderick and Shawn come up to the house. A few minutes later, he saw Aaron and Delkendrick drive up. Broderick and Shawn left, and Juelius saw Aaron and Bryant go inside through the garage. Juelius heard Aaron and Dwain talking, and then, shortly thereafter, he heard a gunshot. Shaking, Juelius went downstairs, where he heard Dwain tell Bryant to go get Delkendrick out of the car.

Juelius left the house and walked to Chris's house, a short distance away, and told Chris that "something crazy" was going on

at his house. As they went back down the hill, Bryant saw Juelius and told him to get a shirt and take it to their little brother at their aunt's house. When Juelius went back inside his house to get the shirt, he saw Aaron's body lying on the floor of a small room off of the kitchen. Juelius left with the shirt, but when he returned, he saw Dwain and Bryant carrying Aaron's body down the stairs into the garage. Two days later, Juelius saw Bryant at a Christmas party in Dumas.

Melvin Walker, an employee of the Asher Body Shop, testified that Bryant came to see him on the afternoon of December 19, 2003, to ask him if he could tow away a car that Bryant claimed had broken down in front of his house. Bryant also told Walker that he was on his way to Pine Bluff.

Aaron's parents reported him missing on Sunday, December 21. During the next several days and weeks, as police officers were investigating Delkendrick's claim that Bryant shot him, they developed Bryant as a suspect in Aaron's disappearance. Bryant was eventually apprehended in Milwaukee, Wisconsin. Bryant waived extradition, and when he was returned to Arkansas, he agreed to show the police where Aaron's body was. Bryant directed officers to the Hensley exit off of Interstate 530. When they pulled off the interstate, Bryant told them to turn down a small logging road; once there, Bryant directed them to a dump site. At the dump site, officers discovered charred human remains, including a skull and some limb bones.

The medical examiner, Dr. Stephen Erickson, testified at trial that Aaron's torso had been incinerated, although the skull and extremities were mostly intact. According to Dr. Erickson, this condition was consistent with an accelerant or a fuel source having been placed over the torso such that the fire burned for a prolonged period of time.

The foregoing evidence clearly supports the State's charges that Bryant acted with premeditation and deliberation in the murder of Aaron Lovelace. By its evidence, the State demonstrated that Bryant tried to clear the potential witnesses away from the area; he pulled Aaron into the house against Aaron's wishes; he closed the door so the act could not be seen; he helped dispose of the body; and he had the victim's car towed away from in front of his house.

In addition, there was evidence that Bryant fled the scene: Melvin Walker stated that Bryant was going to Pine Bluff; Juelius testified that he saw Bryant in Dumas two days later; and Bryant was apprehended in Milwaukee. This court has frequently held that flight following the commission of an offense is a factor that may be considered with other evidence in determining probable guilt and may be considered as corroboration of evidence tending to establish guilt. *See Coggin v. State*, 356 Ark. 424, 153 S.W.3d 757 (2004); *Chapman v. State*, 343 Ark. 643, 38 S.W.3d 305 (2001). Although the State conceded that it was Dwain, and not Bryant, who fired the fatal shot, the above evidence was sufficient to prove that Bryant had the purpose of promoting or facilitating the commission of the offense, and that he aided, agreed to aid, or attempted to aid Dwain in the commission of the murder. *See* Ark. Code Ann. § 5-2-403(a)(2).

In his final point on appeal, Bryant argues that the trial court should not have admitted into evidence photographs taken during the autopsy of Aaron's remains; he contends that the photos were gruesome, irrelevant, and prejudicial. At trial, the State introduced seven color photographs and an x-ray taken at the autopsy. Six of the photos were close-ups of Aaron's skull, and one depicted the skull and other bones recovered from the burned area of the dump site.

This court will not reverse a trial court regarding the admission of photographs absent an abuse of discretion. *DeAsis v. State*, 360 Ark. 286, 200 S.W.3d 911 (2005) (photographs of a burned infant's body not prejudicial); *Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001). The mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it. *DeAsis, supra*. Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: by shedding light on some issue, by providing a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand the testimony. *Id*.

Bryant argues first that the photographs were irrelevant because there was no proof that he had anything to do with the burning of Aaron's body. He concedes, however, that there was proof showing that he helped remove the body from the house,

that he said he was going to Pine Bluff (the body was found between Little Rock and Pine Bluff), and that he took police officers to the location where the burned remains were found. Contrary to Bryant's argument, these facts tend to show that he was indeed involved in disposing of the body.

■ Next, Bryant argues that the photos were irrelevant because they did not pertain to the manner in which Aaron died, or to who brought that death about. However, Dr. Erickson, the medical examiner, testified that the skull was intact, which meant that Aaron had not suffered a gunshot wound to the head. Dr. Erickson also testified that the teeth, which were very well preserved, were used to identify Aaron's remains by way of comparison to his dental records. Further, Dr. Erickson testified about how the state of the bones hindered his ability to perform a complete autopsy. This court has held that the jury has a right to know about the factors that went into the decision of the expert witness, including any autopsy difficulties because of the state of the body. *DeAsis*, *supra*. As such, the trial court did not abuse its discretion in admitting the autopsy photos.

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for adverse rulings objected to by Bryant but not argued on appeal, and no prejudicial error is found.

Affirmed.