375 Ark. 505

**Warren LAW, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 08–231.**

Supreme Court of Arkansas.

Feb. 5, 2009.

J. Blake Hendrix, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Karen Virginia Wallace, Ass't Att'y Gen., for appellee.

ELANA CUNNINGHAM WILLS, Justice.

On March 14, 2005, emergency medical personnel were called to a residence at 4701 Elmwood in Little Rock. Once there, the emergency workers found eighty-six-year-old Geneva Law, covered in bruises and bedsores, with rodent feces on the bedroom floor and ants and cockroaches crawling on the floor, on the bed, and on Geneva. Geneva died in the hospital about a month later. Her son, appellant Warren Law, and her daughter, Mary Law, were both charged on September 11, 2005, with abuse of an adult pursuant to Ark.Code Ann. § 5–28–103 (Repl.1997).[1]

---

1. Warren and Mary were also initially charged with second-degree murder, but the

Prior to trial, Warren filed a motion to dismiss the charges, arguing that the statute under which he was charged was unconstitutionally vague. The Pulaski County Circuit Court denied his motion, and the case proceeded to a bench trial on April 24 and 25, 2007. At that trial, the circuit court convicted Warren of abusing an adult and sentenced him to five years' imprisonment, with three years suspended. On appeal, Warren challenges the sufficiency of the evidence supporting his conviction and the constitutionality of the adult-abuse statute.

 In his first point on appeal, Warren contends that the evidence was insufficient to convict him of abusing an adult. A motion to dismiss in a bench trial is identical to a motion for a directed verdict in a jury trial in that it is a challenge to the sufficiency of the evidence. *See Springs v. State*, 368 Ark. 256, 244 S.W.3d 683 (2006). A challenge to the sufficiency of the evidence asserts that the verdict was not supported by substantial evidence. *See Sales v. State*, 374 Ark. 222, 289 S.W.3d 423 (2008); *Flowers v. State*, 373 Ark. 127, 282 S.W.3d 767 (2008). Substantial evidence is evidence of sufficient force and character that without resorting to speculation and conjecture compels with reasonable certainty a conclusion one way or the other. *Sales, supra*. On appeal, this court does not weigh the evidence presented at trial, as that is a matter for the factfinder, nor do we assess the credibility of the witnesses. *See Woods v. State*, 363 Ark. 272, 213 S.W.3d 627 (2005). We review the evidence in a light most favorable to the State and consider only the evidence that supports the verdict, and we will affirm where the record reveals that substantial evidence sustains the verdict. *See id.*

As mentioned above, Warren was charged with abuse of an adult in violation of Ark.Code Ann. § 5–28–103. That statute provides that it is "unlawful for any person or caregiver to abuse, neglect, or exploit any person subject to protection under the provisions of this chapter." Ark.Code Ann. § 5–28–103(a) (Repl.1997). Although the judgment and commitment order does not specify the particular subsection under which Warren was convicted, the order does state that he was convicted of a Class D felony, and the court commented that this was a case of "extreme neglect." Therefore, we conclude that Warren was convicted under Ark.Code Ann. § 5–28–103(c)(1) (Repl.1997), which provides as follows:

(c)(1) Any person or caregiver who neglects an endangered or impaired adult in violation of the provisions of this chapter, causing serious physical injury or substantial risk of death, shall be guilty of a Class D felony and shall be punished as provided by law.

At the time of the offense, Ark.Code Ann. § 5–28–101 (Supp.2003) provided the following definitions for the relevant portions of the statute:

(3) "Caregiver" means a related or unrelated person ... that has the responsibility for the protection, care, or custody of an endangered or impaired adult as a result of assuming the responsibility voluntarily, by contract, through employment, or by order of the court;

. . . .

(5) "Endangered adult" means:

(A) An adult eighteen (18) years of age or older who is found to be in a

State nolle prossed the murder charges. Mary pled guilty to abuse of an adult and was sentenced to five years' imprisonment.

situation or condition which poses an imminent risk of death or serious bodily harm to that person and who demonstrates a lack of capacity to comprehend the nature and consequences of remaining in that situation or condition;

. . . .

(8)(A) "Impaired adult" means a person eighteen (18) years of age or older who, as a result of mental or physical impairment, is unable to protect himself or herself from abuse, sexual abuse, neglect, or exploitation, and as a consequence thereof is endangered;

. . . .

(10) "Neglect" means acts or omissions by an endangered adult; for example, self-neglect or intentional acts or omissions by a caregiver responsible for the care and supervision of an endangered or impaired adult constituting:

(A) Negligently failing to provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an endangered or impaired adult;

(B) Negligently failing to report health problems or changes in health problems or changes in the health condition of an endangered or impaired adult to the appropriate medical personnel; or

(C) Negligently failing to carry out a prescribed treatment plan[.]

■ Thus, to convict Warren of abuse of an adult, the State was required to prove that: 1) Geneva was an endangered or impaired adult; 2) Warren was a caregiver responsible for her protection, care, or custody; 3) he neglected her; and 4) such neglect caused serious physical injury or risk of death. Warren does not challenge the fourth of these elements. Instead, he contends that the State failed to prove that Geneva was endangered or impaired, that he was her caregiver, and that he neglected her.

■ The first of these elements is whether Geneva was an endangered or impaired adult. As proof on this issue, the State's first witness at trial, Donna Brady, introduced a report from the Adult Protective Services Division of the Department of Health and Human Services.[2] According to Brady, the report indicated that Geneva came to the attention of Adult Protective Services (APS) in April of 2001. At that time, Geneva was living with her sister in Searcy because the home in Little Rock where she had been living with her daughter had been condemned as unsanitary and unsafe. Brady testified that a relative called APS to report that the sister could no longer care for Geneva. The case worker's report from April of 2001 indicated that Geneva was "confused to [the] point [that she] has to be cued to bathe." The report described her as "very confused" and, although ambulatory, she was incapable of meeting her activities of daily living. The report also noted that she was "very confused and could not provide information without relying on her sister."

Because Geneva's sister could no longer care for her, and her own home had been condemned as "unfit for human habitation," APS contacted Warren, who eventually picked Geneva up and took her to live with him and Mary.[3] On April 18, 2001, the APS case worker confirmed with Geneva's sister that Geneva was unable to care for herself. Further, Mary testified

---

2. While Warren did not place a copy of the APS report in his addendum, the report is in the record, and this court may go to the record to affirm. *See, e.g., Brown v. State,* 374 Ark. 341, 288 S.W.3d 226 (2008); *McGehee v. State,* 344 Ark. 602, 43 S.W.3d 125 (2001).

3. Mary moved in with Warren after her house was condemned in 2001.

at trial that, four years later, Geneva was still unable to care for herself and had undergone "a rapid deterioration."

Clearly, the State proved that Geneva was an impaired or endangered adult. A frail, confused, elderly woman who was incapable of meeting her own activities of daily living would certainly have been unable to protect herself from abuse or neglect, thus meeting the definition of "impaired." Further, the APS record indicated that she "showed limited signs of competency," was "very confused," and "could not provide information without relying on her sister." One in this condition would plainly "demonstrate[ ] a lack of capacity to comprehend the nature and consequences of remaining" in a situation that placed her at imminent risk of death or serious bodily harm, thus meeting the definition of "endangered." And as will be discussed more fully below, Geneva's situation most assuredly put her at imminent risk of death or serious bodily harm. Accordingly, the State proved that Geneva was an "endangered or impaired adult." [4]

As to the second element of the offense, Warren asserts that the State failed to prove that he was Geneva's caregiver. As discussed above, a "caregiver" under section 5–28–101(3) is "a related or unrelated person ... that has the responsibility for the protection, care, or custody of an endangered or impaired adult as a result of assuming the responsibility voluntarily, by contract, through employment, or by order of the court." Ark.Code Ann. § 5–28–101(3) (Supp.2003). Warren argues that the State failed to prove that he voluntari-

ly assumed the responsibility of protecting or caring for Geneva.

■ At the outset, we note that "caregiver," as defined in section 5–28–101(3), is one who "has the responsibility for the protection, care, or custody" of an endangered adult. (Emphasis added.) The use of the disjunctive "or" indicates that the State need only prove that an individual has the responsibility for one of these aspects before he or she may be deemed a "caregiver." See, e.g., Bailey v. State, 348 Ark. 524, 529, 74 S.W.3d 622, 624 (2002) ("In its ordinary sense the word 'or' is a disjunctive particle that marks an alternative, generally corresponding to 'either,' as 'either this or that'; it is a connective that marks an alternative.") (quoting McCoy v. Walker, 317 Ark. 86, 89–90, 876 S.W.2d 252, 254 (1994)). Because the State introduced proof that Warren agreed to pick Geneva up from her sister's house in Searcy and bring her home to live under his roof, there was clearly substantial evidence that Warren voluntarily assumed responsibility for Geneva's custody.

However, Warren raises an additional argument wherein he asserts that he could not have been criminally responsible for neglecting Geneva unless he met the definition of "caregiver" found in section 5–28–101(10), which defines "neglect" as the "intentional acts or omissions by a caregiver *responsible for the care and supervision* of an endangered or impaired adult." Ark. Code Ann. § 5–28–101(10) (Supp.2003) (emphasis added). This argument relates to a portion of the third element of the

---

4. Warren cites *Thomas v. State,* 92 Ark.App. 425, 214 S.W.3d 863 (2005), for the proposition that a victim's condition at the time of his or her hospitalization cannot "constitute proof of either alternative status of an 'endangered' or 'impaired' adult." He urges that the "only" evidence that Geneva was an en-

dangered or impaired person consisted of her age and the squalid conditions in which she was found. However, this is simply untrue, as shown by the APS report discussed above, which demonstrated that she was endangered and impaired at the time Warren picked her up at her sister's house in Searcy in 2001.

offense, set out above, regarding whether Warren "neglected" Geneva.

Here, Warren argues that the state failed to prove that he voluntarily assumed the responsibility for Geneva's care and supervision and thus could not have "neglected" her under section 5–28–101(10). He contends that he initially refused this responsibility when Geneva's home was condemned, taking her at that time to live with her sister in Searcy. He also notes that it took APS "several weeks" to locate him when the sister became unable to care for Geneva, and he states that he "only took Geneva into his home when [APS] told him he had to, and only then on the condition that Mary was in his home to provide Geneva 'full-time care.'" On the basis of these factors, Warren maintains that he did not voluntarily assume the responsibility to provide for Geneva's care and supervision, and the State thus failed to prove this element of the crime.

▮ However, while Warren may have acted grudgingly and belatedly, the evidence introduced below supports the trial court's finding that he acted voluntarily and thus was Geneva's "caregiver" under section 5–28–101(3) and was responsible for her "care and supervision" under section 5–28–101(10). Despite his protests that he only took Geneva in when APS told him he "had to," he nonetheless took her in, instead of telling APS to take his mother into the custody of the Department of Human Services or place her in a nursing home. The case summary report from APS states that APS contacted Warren and he indicated that "he would be coming to pick [Geneva] up on [April 18, 2001] to live with him in Little Rock." That it took a few days to locate Warren[5] does not refute or negate the fact that he ultimately took his mother into his home where, according to the report, she could "receive full time supervision."

The report further notes that Mary "will *also* be in the home to provide full time care." (Emphasis added.) The report does not, contrary to Warren's assertion, state that Mary's living in the home was a precondition to Warren's decision to take his mother in, and it does not prove that Mary was intended to be the individual with sole responsibility for caring for Geneva. Rather, it simply indicates that she would be an additional presence in the home. Moreover, although Warren apparently preferred to have his sister attend to Geneva's day-to-day needs, it was nonetheless his decision to personally pick up his endangered and impaired mother and bring her to live under his roof.[6] This decision thereafter effectively denied Geneva any further services from APS, as the case summary report reflected that there was "[n]o further APS needed at this time."

Having brought her into his home under these conditions, Warren voluntarily assumed the responsibility for the protection, care, or custody of an endangered and impaired adult, making him a "caregiver" under section 5–28–101(3), and he was responsible for the care and supervision of that person for purposes of the definition

---

5. In his brief, Warren argues that it took APS "several weeks" to locate him. From the report, however, it appears that it took three or four days to locate Warren, and another six days before he picked Geneva up from her sister's house. The report states that the first home visit and interview with Geneva was on April 9, 2001. APS reached Warren on April 12, 2001, and he picked her up on April 18. Thus, his statement that it took "several weeks" to locate him is mere hyperbole.

6. The APS report states that Warren "advised he would come and get [Geneva] to live with him and her daughter."

of "neglect" under section 5–28–101(10).[7] Therefore, we conclude that there was substantial evidence showing that. Warren was Geneva's caregiver and that he was a caregiver as that word is used in the definition of neglect.

This leads us to the balance of Warren's third sub-point, wherein he argues that the State failed to prove that he neglected Geneva. Neglect, as defined in section 5–28–101(10), includes "intentional acts or omissions by a caregiver responsible for the care and supervision of an endangered or impaired adult constituting ... negligently failing to provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an endangered or impaired adult."

Warren's argument on the first portion of the "neglect" inquiry focuses on his. claim that he owed no legal duty to Geneva. He notes that the statute requires an intentional act or omission,[8] and he contends that, in order to demonstrate such an act or omission, the State had to prove that he owed a legal duty to act. *See, e.g., Flippo v. State*, 258 Ark. 233, 238, 523 S.W.2d 390, 393 (1975) ("For criminal liability to be based upon a failure to act, it must be found that there was a duty to act—a legal duty and not simply a moral duty."). However, by proving that Warren was Geneva's caregiver under section 5–28–101(3), as well as a person responsible for her care and supervision under section 5–28–101(10), as discussed above, the State proved that Warren did, in fact, have a legal duty to act.

Warren raises a further argument wherein he suggests that, at most, Geneva was an invitee in his home and that he therefore owed her only a duty to refrain from wantonly or willfully causing her injury. *See, e.g., Turner v. Stewart*, 330 Ark. 134, 141, 952 S.W.2d 156, 160 (1997). This argument misses the mark, however, as he had a duty under the statutes discussed above to refrain from engaging in acts or omissions such as "[n]egligently failing to provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an endangered or impaired adult." Ark.Code Ann. § 5–28–101(10)(A) (Supp.2003). "Negligently" is defined in the Arkansas Criminal Code as follows:

A person acts negligently with respect to attendant circumstances or a result of his conduct when he should be aware of a substantial and unjustifiable risk that the circumstances exist or the result will

---

**7.** Warren's protestations that Mary was the person responsible for Geneva's care and supervision, and that his own health problems and work schedule prevented him from assuming that role, go to the weight rather than the sufficiency of the evidence on this point.

**8.** In his brief, Warren argues that the statute requires a "purposeful act or omission." However, at the time the crime was committed, the statute defined neglect as "intentional acts or omissions by a caregiver." *See* Ark. Code Ann. § 5–28–101(10) (Supp.2003). Subsequent amendments to the act clarify that neglect means, in pertinent part, a "purposeful act or omission by a caregiver ... that constitutes negligently failing to ... [p]rovide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medi-

cal services to an adult endangered person or an adult impaired person." Ark.Code Ann. § 5–28–101(11)(B)(i) (Repl.2007) (as amended by Act 1810 of 2005). Act 1810 did not include an emergency clause; therefore, the amendment was not effective until ninety days after the 2005 session adjourned on May 13, 2005. *See, e.g., Reeves v. State*, 374 Ark. 415, 288 S.W.3d 577 (2008) (pursuant to Amendment 7 of the Arkansas Constitution, Acts of the General Assembly that do not contain an emergency clause or a specified effective date become effective on the ninety-first day after the legislature adjourns). As the crime here was committed in March of 2005, the earlier version of the statute is applicable.

occur. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

Ark.Code Ann. § 5–2–202(4) (Repl.1997).

This court has noted that negligent conduct is distinguished from reckless conduct primarily in that it does not involve the conscious disregard of a perceived risk. *See Hunter v. State,* 341 Ark. 665, 19 S.W.3d 607 (2000). In order to be held to have acted negligently, it is not necessary that the actor be fully aware of a perceived risk and recklessly disregard it. It requires only a finding that under the circumstances he should have been aware of it and his failure to perceive it was a gross deviation from the care a reasonable, prudent person would exercise under those circumstances. *Id.* (citing *Phillips v. State,* 6 Ark.App. 380, 644 S.W.2d 288 (1982)). The facts introduced at trial satisfy this requirement.

Angela Bain, a paramedic with Metropolitan Emergency Medical Services (MEMS), testified that she responded to a non-emergency call at 4701 Elmwood in Little Rock on March 14, 2005. As she walked around to the back of the home, she was met with a strong odor that "smelled like rotting flesh." Upon entering the house, she found Geneva, whom she described as having "all kinds of bruises of varying age on her" and in an environment that "was not ... appropriate ... for anyone to be in." Bain stated that there were rodent feces on the floor and ants and cockroaches crawling on the bed and on Geneva. Geneva was lying on a mattress that appeared to be soaked with urine and feces with a deflated plastic mattress, a plastic garbage bag, and soaked newspapers underneath her.

Sergeant Cristie Phillips of the Little Rock Police Department testified that when she got to the scene, Geneva had already been transported to the hospital by medical personnel, but she could "immediately smell just an overwhelming stench of feces. It smelled like rotting flesh." Phillips also went to the hospital to take photographs of Geneva, whom Phillips said was "black and blue all over." One of Geneva's ears was completely swollen shut, and she had bruises all over her face. She also had "crater-sized" bedsores that "you could have stuck your fist in." Phillips noted that at the time she arrived in the emergency room, there were still ants crawling on Geneva, and nurses were "picking the ants off her skin."

Kimberly Finklestein, a crime scene specialist with the Little Rock Police Department, testified that the house was in "disarray" and was "extremely, extremely filthy." She saw what appeared to be animal feces on the floor of Geneva's room, as well as the rest of the house. The mattress of Geneva's bed was soaked and stained with urine and mold, as was the carpet underneath the bed. There were ants and roaches "just crawling everywhere." When Finklestein went to the hospital to see Geneva, she said that she knew she was approaching Geneva's room because, as she was walking down the hallway, she could smell the same stench she had smelled in the house. On redirect examination, Finklestein testified that there was no part of Warren's house where one could not smell "that smell."

Little Rock Code Enforcement Supervisor Sheila Reynolds testified that she was asked to go the Elmwood residence by police. After confirming in the property records that the house belonged to Warren, Reynolds went to the residence some

four and a half hours after Geneva had been taken to the hospital. She stated that when she got to the door, there was "such a strong odor that we had to turn around and go back to our vehicle and get some Vick's and put across our nose so we could go in." She described the smell as being a "very strong urine smell" and a "rotted-flesh type smell."

Reynolds described the house, stating that there was a "lot of stuff piled on the floor." In Geneva's room, there were "feathers and rat droppings, possibly rabbit droppings" on the floor by her bed, and the bed appeared to be stained with bodily fluids. Ants were crawling on the comforter, and there was "trash and stuff in the closet, kind of like maybe an animal had lived in there." The remainder of the house was "unsanitary" and "filthy," and the bathtub was black with mold and mildew. There was nothing between Geneva's room and the rest of the house that would have sealed her area off, other than a bedroom door.

The State also called Lynn Espejo, the clinic administrator for Geneva's former doctor, Dr. Scott Brown. Espejo testified that Geneva had not been in to see the doctor since January of 2001. At that time, Geneva weighed 162 pounds and was classified as "obese." She noted that there had been calls from the pharmacy to refill Geneva's blood-pressure medication, but she said that in 2004, Dr. Brown refused to confirm her prescription until she came back in to see him.

Dr. Moses Ejiofor was the emergency room physician on call the day that Geneva was brought to the hospital. He said that she "looked like bone" and was very weak, disheveled, unkempt, and malnourished. Dr. Ejiofor also described the smell of rotting flesh, which he determined was coming, at least in part, from a large wound on her back through which he could see the outline of her spine. Geneva had other large ulcers on her pelvis, a large blood clot in her left ear, and bruises all over her body; further, the bruises were not all consistent with her having fallen. Her bedsores were necrotic and black and appeared to have been there for some time. Dr. Ejiofor said that he knew Geneva was in pain and he could hear her moaning, but she was so weak that she could not even flinch away from him. In addition to her other injuries, Geneva also had a fluid build-up or bleeding inside her brain, which was consistent with trauma. Cultures of her eyes revealed the presence of three different bacteria, and "approximately eight to nine organisms" were cultured from the ulcers.

Plainly, the above testimony constituted substantial evidence that Warren should have been aware of the risk to Geneva, and his failure to perceive the risk posed to his mother was a gross deviation from the care a reasonable, prudent person would exercise under those circumstances. Numerous witnesses testified to the filth in the house and the overwhelming stench of rotting flesh that permeated the environment. It is inconceivable that these conditions went unnoticed,[9] and it is equally inconceivable that these conditions arose overnight. By allowing the squalor to proliferate unchecked, and by either fail-

9. Warren did introduce the testimony of his estranged wife, Shannon Law, who stated that Warren's sense of smell was not the best. Apparently, he did not believe her when she said she smelled gas in the house, although he eventually repaired the gas leak, which stemmed from an extinguished pilot light. However, it was the trial court's duty to assign whatever weight it chose to this testimony. *See, e.g., Buford v. State*, 368 Ark. 87, 243 S.W.3d 300 (2006) (the trier of fact alone determines the credibility of witnesses and apportions the weight to be given to the evidence).

ing or refusing to remedy the circumstances, it is plain that Warren, as caregiver, negligently failed to "provide necessary treatment, ... care, ... shelter, [or] supervision" for Geneva, an endangered or impaired adult. In short, the evidence demonstrated that Warren was guilty of neglecting Geneva.

In his second point on appeal, Warren urges that the circuit court erred in denying his motion to dismiss the charges against him on the grounds that the section 5–28–103 is void for vagueness. Statutes are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. *Bowker v. State,* 363 Ark. 345, 214 S.W.3d 243 (2005); *Reinert v. State,* 348 Ark. 1, 71 S.W.3d 52 (2002). If it is possible to construe a statute as constitutional, we must do so. *Bowker, supra.* Because statutes are presumed to be framed in accordance with the Constitution, they should not be held invalid for repugnance thereto unless such conflict is clear and unmistakable. *Id.*

We have said that a law is unconstitutionally vague under due process standards if it does not give a person of ordinary intelligence fair notice of what is prohibited and it is so vague and standardless that it allows for arbitrary and discriminatory enforcement. *Id.* (citing *Cambiano v. Neal,* 342 Ark. 691, 35 S.W.3d 792 (2000)). As a general rule, the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the facts at issue. *Id.; Graham v. State,* 365 Ark. 274, 229 S.W.3d 30 (2006). When challenging the constitutionality of a statute on the grounds of vagueness, the individual challenging the statute must be one of the "entrapped innocent" who has not received fair warning. *Graham, supra.* If, by his action, that individual clearly falls within

the conduct proscribed by the statute, he cannot be heard to complain. *Id.*

On appeal, Warren argues that section 5–28–103 is unconstitutionally vague in its definition of "caregiver." He states that section 5–28–101(3) defines a caregiver as "a related ... person ... that has the responsibility for the protection, care, or custody of an endangered or impaired adult as a result of assuming the responsibility voluntarily, by contract, through employment, or by order of the court." On the other hand, in defining "neglect," section 5–28–101(10) imposes criminal liability only on a caregiver who is "responsible for the care and supervision of an endangered or impaired adult." According to Warren, the statute is thus "inconsistent in defining who is a caregiver criminally liable for neglect."

However, as discussed above, the facts demonstrated that Warren clearly met either definition of "caregiver." He voluntarily assumed the responsibility for the protection, care, or custody of an endangered and impaired adult, and he was responsible for the care and supervision of that person. Because the facts adduced at trial place Warren squarely within the definitions of "caregiver," he is not an "entrapped innocent" and thus cannot complain that the statute is unconstitutionally vague. *See, e.g., Talbert v. State,* 367 Ark. 262, 239 S.W.3d 504 (2006).

Warren raises an additional point suggesting that the word "caregiver" can be read so broadly as to "impose a legal duty of care and protection on one who invites another to be his or her roommate" or on the owner of a bed-and-breakfast. However, this court has stated that if a statute clearly applies to the conduct of the party challenging the statute, the fact that the statute may be questionable in its applica-

tion to speculative situations is immaterial. *See Talbert, supra.*

Affirmed.