2010 Ark. App. 392

**Charles E. SKOMP, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 09–1171.**

Court of Appeals of Arkansas.

May 5, 2010.

Joseph Paul Mazzanti, Lake Village, AR, for appellant.

Dustin McDaniel, Atty. Gen., Brad Newman, Asst. Atty. Gen., Little Rock, AR, for appellee.

KAREN R. BAKER, Judge.

A jury in Bradley County Circuit Court convicted appellant Charles E. Skomp of the offense of abuse of an endangered or impaired person as a class D felony, in violation of Ark.Code Ann. § 5–28–103(a) (Repl.2006). The jury sentenced appellant to six years' imprisonment in the Arkansas Department of Correction. Appellant was tried along with three other defendants, each represented by separate counsel, for the abuse of his stepsister, Brenda Klines, a mentally impaired adult woman. Appellant's only argument on appeal is that the evidence was insufficient to support his conviction. We disagree and affirm the trial court's decision.

On July 9, 2008, the State filed an amended felony information in which it charged appellant, Steven Skomp, Curtis Klines, and Susie Klines with one count each of abuse of an impaired person, a Class D felony, and first-degree false imprisonment. Prior to trial, the State dismissed the first-degree false-imprisonment charge. Curtis Klines and Susie Klines are married. The victim of the alleged abuse is Brenda Klines, Curtis Klines's daughter by a previous marriage. Appellant and Steven Skomp are Susie Klines's sons by a prior marriage and are Brenda's stepbrothers.

Jeremy Chapman, a patrolman for the Warren Police Department in April and May of 2008, testified at trial that he was called to a hospital to take a report from Brenda regarding injuries she had sustained. Brenda had arrived at the hospital with injuries that included contusions on both sides of her head, swelling around both sides of the head and neck, soft tissue swelling from both ears, some bleeding from around the neck, bruising to the soles of the feet, and bruising and redness to the lower back and legs. After Chapman spoke with Brenda, he contacted the Arkansas Department of Human Services (DHS), who sent adult-abuse investigators to the hospital. He then accompanied the DHS investigators to the Klines residence. Chapman was present when the DHS workers interviewed appellant and the other defendants. According to Chapman, Steven Skomp told the workers that as a punishment for Brenda for taking his candy or cell phone, they would make Brenda stand up against a wall on the tips of her toes and stretch her arms out as far as she could. Chapman testified that, at the DHS workers' request, he took a piece of wood and a belt that were found in the home into evidence.

Mark Wargo, a licensed psychological examiner, performed a psychological evaluation of Brenda on May 1, 2008. Wargo observed that when he evaluated Brenda, she appeared older than her stated age of 49. Wargo testified that Brenda also appeared undernourished, with low body weight and multiple bruises on her body, including bruising to her head and neck. Wargo testified that based on his examination, he found that Brenda met the criteria for moderate mental retardation and that Brenda functioned at about a second-grade educational level, with the independence level of someone who was seven years, eight months of age. Wargo testified that

Brenda told him that she was using a slop bucket to relieve herself. Wargo stated that Brenda told him the bruises occurred when she tripped over the slop bucket and fell; however, Wargo felt that the bruising covered more areas of her body than would have been caused by only a single incident.

Shawn Hildreth, a criminal investigator with the Warren Police Department, testified that he interviewed all of the defendants at the Warren Police Department. He had taken possession of the evidence that Chapman had obtained, which Hildreth described as a one-foot long wooden board and a brown leather belt with no buckle. Hildreth stated that Curtis Klines appeared to be in ill health at the time and denied having any knowledge of any abuse to which Brenda may have been subjected. Susie Klines told him that Brenda would be made to stand in the corner facing the wall for up to two hours at a time, and sometimes on one leg, as punishment for taking food and not cleaning the residence thoroughly. Hildreth testified that he attempted on one occasion during his investigation to stand on one leg and was only able to do so for approximately thirteen minutes without cramping and discomfort. In explaining the family's restriction of Brenda's food, Susie claimed that Brenda was a borderline diabetic, and she would steal candy and sweets. Susie also told Hildreth that Brenda stayed in a trailer behind the residence that would be locked at night and sometimes during the day to keep Brenda from coming out and taking food and also to keep Brenda's sister, who was not a resident of the house, from coming to spend the night in the trailer; but then Susie stated that they would only lock the trailer when they would leave to go run errands. Steven Skomp also told Hildreth that Brenda would be forced to stand in the corner for up to an hour, sometimes on one leg. Hildreth testified

that Steven also said that he assumed Brenda's trailer was locked at night. Steven told Hildreth he was not aware of Brenda ever falling down.

Hildreth testified that appellant told him that he never physically struck Brenda, but he had made her stand in the corner and face the wall. He also locked her in the trailer as punishment for talking back and stealing "my food." Appellant self-proclaimed that he was a "reversed diabetic from Brenda" who bought candy and cupcakes because he occasionally needed sugar, and Brenda would steal his sweets and eat them. Appellant told Hildreth that he became frustrated with Brenda stealing his sweets and "told his mother [Susie] that something had to be done or he was going to do something about it," which resulted in the family getting the trailer, putting a lock on it, and moving Brenda into it as a place to live. Hildreth testified that all of the family members he interviewed acknowledged that Brenda's trailer had no electricity or running water, that Brenda had been provided a five-gallon bucket to use as a bathroom, and that she had a box fan to keep cool, which was powered by an extension cord running from the house.

Denise Wright Smith, one of the DHS investigators who interviewed the other adults in the Klines household, testified that when she saw Brenda Klines, she observed "a very malnourished, frail, thin woman, quite scary looking," who was covered in bruises and other marks. Smith testified that Curtis Klines told the DHS investigators that if Brenda got into food or other things they did not want her to get into, they disciplined her by "whupping" her; but then he later denied that he "whupped" her. He claimed that the board and belt were used to discipline the family's cat. Both of the Klineses told the workers that Brenda had behavior prob-

lems and would sometimes get out of control. They also said that Brenda did not need to eat sugar or salt due to health conditions. Appellant told the investigators that they would have Brenda stand in a corner on her tiptoes and reach for the ceiling, and Steven Skomp confirmed it. A review of Brenda's trailer showed that the refrigerator was empty and the bathroom door was screwed shut. All power was cut off at the breaker box to the trailer, and a box fan and a clock were powered through an extension cord that ran outside the trailer. Dr. David Foscue testified that Brenda had been his patient for several years. Dr. Foscue stated that Brenda had previously presented with malnutrition, some dehydration, and an occasional urinary-tract infection or laceration. He stated that he had addressed the malnutrition and dehydration issues with the Klineses previously, and that Brenda had not had problems with blood sugar or blood pressure while under his care. Dr. Foscue testified that when he saw Brenda when she was admitted to the hospital, he was shocked at her appearance. When he questioned her, she said that she fell. Dr. Foscue stated that Brenda's bruising would not have happened from a fall. Dr. Foscue testified that although he could not determine exactly what happened to Brenda, it "definitely was not a fall." Dr. Foscue also determined that Brenda's injuries were not the result of a seizure. He noted that the bruising and swelling covered multiple areas of her body, from her head and ears to the soles of her feet. Dr. Foscue also observed that some of the bruising appeared to be very recent, while some of it appeared to be several weeks old. Dr. Foscue testified that Brenda told him that she did not want to go home because she would "get a whupping." Dr. Foscue further testified that Brenda told him that Susie or Curtis would "whup" her with a paddle and that "the boys" would

hold her down while she got a "whupping." In her descriptions of the "whuppings" to Dr. Foscue, Brenda said that "they would hurt really bad." Brenda indicated that the last time this happened was a week before she went into the hospital.

Brenda's sister, Louise Pitts, testified that Brenda came to live with her after she got out of the hospital. Pitts testified that when Brenda first came to her home, Brenda was terrified and had frequent nightmares. She also stated that Brenda ate constantly. According to Pitts, Brenda weighed approximately 100 pounds when she first came to stay with her and 145 pounds a few weeks prior to the trial. Pitts testified that at the time of trial, Brenda continued to have headaches and problems with her hearing due to the damage to her ears.

After the State rested its case, defendant Steven Skomp made a motion for directed verdict, and appellant adopted all of Steven's arguments. Appellant argued in his motion that the State failed to prove (1) that he was Brenda's caregiver, (2) that he abused her, and (3) that any actions attributed to him caused her to suffer physical injury. The trial court ruled that, viewing the evidence in the light most favorable to the State, appellant assumed the position of caregiver to Brenda, Brenda was an impaired or endangered person, and Brenda sustained physical injury. However, the trial court granted a directed verdict with respect to the offense being a Class B felony because the court concluded that the State failed to prove that any abuse resulted in serious physical injuries; accordingly, the trial judge reduced the charge to a Class D felony, reserving the question whether appellant had committed a Class D felony for the jury. Following the guilt phase of the trial, the jury returned a verdict of guilty on the charge of abuse of an impaired

person, a Class D felony. The trial court sentenced appellant to seventy-two months' imprisonment in the Arkansas Department of Correction, and this appeal followed.

■■■ Appellant argues on appeal that the trial court erred by denying his motion for a directed verdict. A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Kelley v. State,* 103 Ark. App. 110, 286 S.W.3d 746 (2008). In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which |₈is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. We defer to the jury's determination on the matter of witness credibility. *Id.* Jurors do not and need not view each fact in isolation, but rather may consider the evidence as a whole. *Id.* The jury is entitled to draw any reasonable inference from circumstantial evidence to the same extent that it can from direct evidence. *Id.*

Appellant was convicted of abuse of an impaired person, a Class D felony, in violation of Arkansas Code Annotated section 5–28–103, which states that "[i]t is unlawful for any person or caregiver to abuse, neglect, or exploit any endangered person or impaired person subject to protection under a provision of this chapter." Ark. Code Ann. § 5–28–103(a). In particular, the provisions regarding abuse that causes physical injury state, in pertinent part, as follows:

> If the *abuse* causes physical injury, any person *or* caregiver who purposely *abuses* an adult endangered person or an adult impaired person in violation of a

provision of this chapter is guilty of a Class D felony.

Ark.Code Ann. § 5–28–103(b)(2) (emphasis supplied). The offense is a Class B felony if it results in serious physical injury or a substantial risk of death. *See* Ark.Code Ann. § 5–28–103(b)(1).

■ For his first point on appeal, appellant argues that the State failed to prove that he was a caregiver to Brenda, which he contends is necessary for a conviction under section 5–28–103. In support of his argument, appellant cites our supreme court's decision in *Law v. State,* |₉375 Ark. 505, 292 S.W.3d 277 (2009). In *Law,* the court interpreted section 5–28–103(c)(1), which sets forth the elements of neglect of an endangered or impaired adult, to require proof that the defendant had assumed the position of caregiver. The State argues that appellant is misreading the holding in *Law,* and that the holding in that case does not apply here. We agree with the State. In *Law,* the supreme court did hold that the State was required to prove that the defendant in that case was a caregiver in order to sustain a conviction. The key distinction between *Law* and this case is that the supreme court specifically determined that the defendant in *Law* was convicted of *neglect* of an impaired person under section 5–28–103(c)(1), while appellant was convicted of *abuse* of an impaired person under section 5–28–103(b)(2). The Code's definition of "neglect" with respect to the provisions regarding abuse of adults includes the following:

> A purposeful act or omission *by a caregiver* responsible for the care and supervision of an adult endangered person or an adult impaired person that constitutes negligently failing to:
>
> (i) Provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an

adult endangered person or an adult impaired person;

(ii) Report a health problem or a change in a health problem or a change in the health condition of an adult endangered person or an adult impaired person to the appropriate medical personnel;

(iii) Carry out a prescribed treatment plan; or

(iv) Provide a good or service necessary to avoid physical harm, mental anguish, or mental illness as defined in regulations promulgated by the Office of Long–Term Care of the Division of Medical Services of the Department of Health and Human Services to an adult long-term care facility resident.

Ark.Code Ann. § 5–28–101(11)(B) (Repl. 2006) (emphasis supplied). Therefore, the supreme court reasoned that being a caregiver was an element necessary to prove "neglect" of an impaired person under section 5–28–103(C). On the other hand, "abuse" is defined as follows:

(A) Any purposeful and unnecessary physical act that inflicts pain on or causes injury to an endangered person or an impaired person;

(B) Any purposeful or demeaning act that a reasonable person would believe subjects an endangered person or an impaired person, regardless of age, ability to comprehend, or disability, to ridicule or psychological injury in a manner likely to provoke fear or alarm;

(C) Any purposeful threat that a reasonable person would find credible and nonfrivolous to inflict pain on or cause injury to an endangered person or an impaired person except in the course of medical treatment or for justifiable cause; or

(D) With regard to any adult long-term care facility resident by a caregiver, any purposeful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain, or mental anguish.

Ark.Code Ann. § 5–28–101(1). The definition of abuse does not contain the requirement that the person committing the abuse be a caregiver, except under section 5–28–101(1)(D), where the victim is a resident in an adult long-term care facility, which Brenda was not. Rather, section 5–28–103(a) makes it unlawful for "*any person or caregiver*" to abuse an impaired person. Further, the legislature also chose to require the disjunctive "*any person or caregiver*," who purposely abuses an impaired person, which causes physical injury, in order to meet the requirements set forth in section 5–28–103(b)(2) of the Code. Therefore, because appellant was convicted of abuse and not neglect, the supreme court's decision in *Law* does not apply. The State was not required to prove that appellant was a caregiver to Brenda.[1]

■ Appellant's second argument on appeal is that the State failed to prove that

---

1. Even if the court were to consider whether appellant was a caregiver for purposes of the statute, the State presented substantial evidence to support such an element. Caregiver is defined as "a related or unrelated person ... that has the responsibility for the protection, care, or custody of an adult endangered person or an adult impaired person as a result of assuming the responsibility voluntarily, by contract, through employment, or by order of the court." Ark.Code Ann. § 5–28–101(3).

There was testimony that appellant lived in the same household as Brenda and that he claimed he would punish her "for her own good" because they "could not beat her," although there was testimony that she was held down by the brothers while she received "whuppings" with a belt and paddle. This evidence was sufficient for the jury to conclude that appellant was voluntarily acting as a caregiver for Brenda.

he abused Brenda. As set forth above, "abuse" includes "[a]ny purposeful and unnecessary physical act that inflicts pain or causes injury to ... an impaired person." Ark.Code Ann. § 5–28–101(1)(A). As appellant does not contend that Brenda failed to meet the definition of an "impaired person," we need not consider that element of the definition of abuser. The State presented ample evidence at trial of appellant's purposeful and unnecessary physical acts that inflicted pain or caused injury to Brenda. The State produced testimony that appellant would force Brenda to stand for long periods of time and that he assisted in the Klineses' beatings of Brenda, and produced evidence of the physical injuries with which she presented at the hospital. This was sufficient evidence for the jury to conclude that appellant committed acts that would fall under the definition of abuse.

Appellant's final point on appeal is that the State failed to prove that any of his actions caused physical injury to Brenda. As noted above, Dr. Foscue testified that Brenda's extensive bruising could not have occurred in the manner she described. In addition, Brenda told Dr. Foscue that appellant assisted the Klineses in beating her. In determining whether a physical injury exists, a jury may rely upon its common knowledge, experiences, and observations in life to make this determination. *Butler v. State,* 2009 Ark. App. 695, 371 S.W.3d 699. The State produced sufficient evidence to allow the jury to conclude that appellant's actions resulted in physical injury to Brenda.

Affirmed.

PITTMAN and HART, JJ., agree.